United States Court of Appeals,

Eleventh Circuit.

No. 95-3131

Non-Argument Calendar.

Dave BIDDULPH, Tax Cap Committee, Plaintiffs-Appellants,

v.

Sandy MORTHAM, Florida Secretary of State, Defendant-Appellee.

Aug. 1, 1996.

Appeal from the United States District Court for the Northern District of Florida. (No. 94-40534-CV-WS), William Stafford, Judge.

Before TJOFLAT, Chief Judge, and KRAVITCH and HATCHETT, Circuit Judges.

PER CURIAM:

## I. Introduction

Appellant Dave Biddulph is a proponent of "Voter Approval of New Taxes," an initiative proposal to amend the Florida Constitution to prohibit the imposition of any new state or local taxes except upon voter approval. Appellant Tax Cap Committee ("Tax Cap"), formed by Biddulph, is the initiative proposal's official sponsor committee. "Voter Approval of New Taxes" was ultimately excluded from the ballot for failure to comply with Florida requirements governing the substance and titles of amendments proposed by initiative. Appellants contend that Florida's initiative process violates their First and Fourteenth Amendment rights because Florida's process is not "narrowly tailored." Appellants argue that instead of simply excluding the proposed amendment from the ballot, Florida could provide initiative proposal sponsors an opportunity to correct the title

and language of deficient proposals.  This is a case of first impression in this circuit.  We hold that state initiative regulations, like the ones in this case, that do not burden "core political speech," are content-neutral, and do not disparately impact particular political viewpoints are not subject to strict scrutiny under the First Amendment.

## II. Florida's Constitutional Amendment Initiative Scheme

### A. Substantive Requirements

Florida's Constitution gives the "people" the power to propose amendments to the state constitution.  Fla. Const. art. XI, § 3.  Until November 1994, the Florida Constitution required that amendments proposed by initiative address a single subject and that initiative petitions be signed by some percentage of the electorate:

> The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that any such revision or amendment shall embrace but one subject and matter directly connected therewith.  It may be invoked by filing with the secretary of state a petition containing a copy of the proposed revision or amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight per cent of the votes cast in each of such districts, respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.

Fla. Const. art. XI, § 3 (West 1993).  In 1994, after Biddulph's proposed amendment was removed from the ballot, Florida voters approved a constitutional amendment that excepted from the single-subject requirement of Article XI, Section 3, any revisions or amendments limiting the power of government to raise revenue.  *See* Fla. Const. art. XI, § 3 (West 1995).

A Florida statute further requires that initiative proposal

sponsors write and submit in clear and unambiguous language (1) an "explanatory statement" or "substance" of the amendment, not to exceed 75 words, describing the chief purpose of the measure and (2) a title, not to exceed 15 words.  The substance and title alone appear on the ballot.  Fla.Stat.Ann. § 101.161 (West Supp.1996).

## B. Procedure for Initiative Approval

Before an initiative petition may be circulated for signatures, the proposal's sponsor must register as a political committee and submit the petition form to the secretary of state for approval.  Fla.Stat.Ann. § 100.371(3) (West 1982).  The secretary of state, through the Division of Elections, evaluates the petition format but does not review the text of the proposed amendment or its ballot summary and title to determine whether they comply with the constitution's single subject requirement and § 101.161.  Fla.Stat.Ann. § 100.371(3) (West 1982); Fla.Admin.Code Ann. r. 1S-2.009(1) (1996).  If the proposed initiative amendment petition format is deemed sufficient by the Division of Elections, the sponsor may circulate petition forms for signatures. Fla.Admin.Code Ann. r. 1S-2.009(2) (1996).  After collecting the signatures, the sponsor must submit the signed petition forms to the appropriate supervisor of elections who, upon payment of a fee equal to the sum of ten cents per signature checked or the actual costs of checking each signature, verifies the signatures on the petition forms and submits a certificate to the secretary of state indicating the total number of signatures checked, the number deemed valid, and the geographical distribution.  Fla.Stat.Ann. § 100.371(4) (West Supp.1996), Fla.Stat.Ann. § 99.097(4) (West

Supp.1996).  If the secretary of state determines that the sponsor has obtained the constitutionally required number of signatures with the appropriate geographical distribution, certification of ballot position will be issued to the sponsor.  Fla.Admin.Code Ann. r. 1S-2.0091(4).

The secretary of state must then submit the sponsor's initiative petition to the attorney general, Fla.Stat.Ann. § 15.21 (West 1988), who in turn must petition the Florida Supreme Court for an advisory opinion regarding the compliance of the text of the proposed amendment with the single subject requirement of Art. XI, § 3 of the state constitution and the compliance of the proposed ballot title and substance with § 101.161.  *See* Fla.Stat.Ann. § 16.061 (1995);  *see also* Fla. Const. art. IV, § 10 (requiring attorney general to request supreme court's opinion regarding validity of any initiative petition).  If the state supreme court finds either that the proposed amendment violates the single-subject requirement or that the proposed ballot title or summary is ambiguous, the supreme court will order removal of the initiative petition from the ballot.  *See, e.g., In re Advisory Opinion to the Attorney General-Restricts Laws Related to Discrimination,* 632 So.2d 1018, 1021 (Fla.1994).

## III. Facts

In 1993, Biddulph registered Tax Cap as sponsor committee for the proposed "Voter Approval of New Taxes" amendment.  In August 1993, the Secretary of State approved Biddulph's initiative petition format.  Biddulph then circulated the petition in an attempt to place the proposed amendment on the November 1994

ballot. Less than a year later, Biddulph submitted the signed petition forms to the supervisor of elections, who verified the signatures and transmitted the certificates to the Secretary of State. The Secretary of State certified the proposed "Voter Approval of New Taxes" amendment for a ballot position in the November 1994 election.

Pursuant to Florida law, the Secretary of State submitted the initiative proposal to the attorney general, who sought an advisory opinion from the supreme court on the legal sufficiency of the proposal. Over two months later, and only a month before the 1994 election, the supreme court issued an opinion concluding that Biddulph's proposed amendment was legally insufficient for two reasons: it violated the constitutional single-subject requirement, and it violated § 101.161 because its title was misleading. *Advisory Opinion to Attorney to Attorney General re Tax Limitation,* 644 So.2d 486, 491-94 (Fla.1994). The Secretary of State then directed the supervisors of elections to remove Biddulph's amendment proposal from the ballot.

Nine days later, Biddulph filed a petition for a writ of mandamus asking the Florida Supreme Court to order the Secretary of State to eliminate the deficiencies in the title and summary of Biddulph's initiative proposal and to place the revised language on the ballot for the November 1994 election. The supreme court denied the petition.[1] Biddulph then filed this action in federal

---

[1]The Florida Supreme Court denied Biddulph mandamus relief on the same federal claim he raises here. The existence of this state court ruling calls our subject matter jurisdiction into question under the *Rooker-Feldman* abstention doctrine. *See District of Colombia Court of Appeals v. Feldman,* 460 U.S. 462,

court, pursuant to 42 U.S.C. § 1983, against the Secretary of

---

480-82, 103 S.Ct. 1303, 1314-15, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). Although no party has raised this issue, we cannot proceed without subject matter jurisdiction.

The *Rooker-Feldman* doctrine, based on statutory jurisdictional limitations, teaches us that federal district courts have no authority to review final judgments of state courts. The rule applies "not only to claims actually raised in the state court, but also to claims that were not raised in the state court but are "inextricably intertwined' with the state court's judgment." *Powell v. Powell,* 80 F.3d 464, 466 (11th Cir.1996).

This circuit recognizes an exception to the *Rooker-Feldman* doctrine, however, when the plaintiff has no "reasonable opportunity to raise his federal claim in state proceedings." *Id.* at 467. (citing *Wood v. Orange County,* 715 F.2d 1543, 1547 (11th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984)). That exception applies here. In Florida, mandamus is not awarded as a matter of right but at the court's discretion, *Somlyo v. Schott,* 45 So.2d 502, 504 (Fla.1950), and only upon a showing of a clear legal right to performance of an indisputable legal duty, *State ex rel. Eichenbaum v. Cochran,* 114 So.2d 797, 800 (Fla.1959).

Because the Florida Supreme Court has strictly limited authority to grant a writ of mandamus to those cases where there is a clear right to performance of an indisputable legal duty, the state mandamus proceeding did not afford Biddulph the kind of "reasonable opportunity" to raise his federal claim that would preclude our independent review of that claim. The Florida Supreme Court's refusal to grant a writ of mandamus means only that the state court failed to find it clear and indisputable either that the state initiative system violated the First Amendment or that the state initiative process had to be altered in the manner Biddulph requested in order to comply with the First Amendment. In fact, Florida courts could probably never grant mandamus relief for such a novel (and therefore disputable) federal constitutional claim. *See, e.g., Kane Homes, Inc. v. City of North Lauderdale,* 418 So.2d 451, 453 n. 3 (Fla. 4th Dist.Ct.App.1982) (mandamus will apply "when the law prescribes and defines [a duty] with such precision and certainty as to leave nothing to the exercise of discretion or judgment") (quoting *State ex rel. Zuckerman-Vernon Corp. v. City of Miramar,* 306 So.2d 173, 175 (Fla. 4th Dist.Ct.App.1974), *cert. denied,* 320 So.2d 389 (Fla.1975)).

State.  The district court, concluding that Biddulph had failed to state a claim, dismissed his case.

## IV. Discussion

## A. Mootness

Although the November 1994 election has passed, this case is not moot.  Biddulph's signed and verified petition forms are valid in Florida for four years after the date the signatures were affixed to the forms.  Fla.Stat.Ann. § 100.371(2).  The signatures were collected in either 1993 or 1994, so Biddulph's verified petition forms are valid at least through 1997.  Therefore, were we to order the state to revise the ballot title and or amendment language to comply with state law as Biddulph requests, Biddulph's proposed amendment presumably could be placed on the ballot in an upcoming election.

The Secretary of State contends that this case is moot on other grounds:  the single subject requirement of Article XI, Section 3 no longer applies to initiative proposals, that like Biddulph's, involve revenue measures, and the Florida Supreme Court recently issued an opinion granting ballot access to a previously-excluded revenue amendment as a result of that change. *See Advisory Opinion to the Attorney General Re Tax Limitation*, 673 So.2d 864 (1996) ("*Tax Limitation II* ").  The implication of the Secretary of State's motion is that Biddulph's proposed amendment will likewise be deemed legally sufficient and granted ballot access.  Neither the amendment to Article XI, Section 3 nor Florida's decision in *Tax Limitation II* renders this case moot, however.  The supreme court had originally denied ballot access to

the proposed amendment at issue in *Tax Limitation II* only because it violated the single subject requirement. *Advisory Opinion to Attorney to Attorney General re Tax Limitation,* 644 So.2d 486, 491 (Fla.1994). In contrast, the court excluded Biddulph's "Voter Approval of New Taxes" proposal not only because it violated the constitutional single subject requirement but also because it violated the clear ballot title requirement of Fla.Stat.Ann. § 101.161. 644 So.2d at 491-94. Because the court had an alternative basis for denying ballot access to "Voter Approval of New Taxes," the Florida Supreme Court need not, as it did in *Tax Limitation II,* revisit its decision to exclude the proposed amendment from the ballot. Thus, there is no reason to believe that the Florida Supreme Court will reverse its decision to exclude Biddulph's proposal from the ballot, and the controversy remains alive.

## B. Biddulph's claim

Biddulph seeks strict scrutiny of Florida's initiative regulations. He argues that the United States Constitution requires Florida to narrowly tailor any restriction it imposes upon the initiative petition process and to avoid unnecessary impediments. He also contends that such restrictions must serve a compelling state interest.[2] Although Biddulph admits that judicial review of proposed amendments for legal sufficiency is permissible, he points to two aspects of the initiative process that, he claims,

---

[2]Biddulph argues that the state must "narrowly tailor any restrictions it imposes upon" the initiative process and "avoid unnecessary impediments." Appellant's Brief at 36. Biddulph further contends that Florida "may not abridge First Amendment rights without establishing compelling necessity." *Id.* at 43.

are overly and unnecessarily burdensome. Biddulph contends that delaying judicial review for legal sufficiency until after petition circulation injects unnecessary risk into the process. Furthermore, Biddulph argues, the Florida Supreme Court has failed to provide clear and objective standards governing the legal sufficiency of initiative proposals. The result, according to Biddulph, is that initiative sponsors must complete Florida's costly and time-consuming initiative requirements[3] without any assurance that the supreme court will ultimately deem their initiative proposals legally sufficient for ballot inclusion. In other words, entering Florida's initiative process is a financial gamble for initiative proposal sponsors. The deterrent effect of the risk involved, according to Biddulph, is constitutionally impermissible because it burdens protected First Amendment activity without being narrowly tailored to meet a compelling government interest.

Biddulph asks this court to remedy the alleged constitutional defect in the initiative process by requiring Florida "to more narrowly tailor" its regulatory initiative process by providing a procedure either for revising initiative proposal language deemed legally insufficient or for review of a proposal's legal sufficiency before petition circulation. We must determine whether Biddulph has stated a constitutional claim and what constitutional right is at stake.

---

[3]Biddulph claims that in collecting the 400,000 signatures required he expended thousands of hours of effort and hundreds of thousands of dollars and that he paid the supervisors of elections more than $25,000 to verify the signatures.

C. The Right to Petition the Government for Redress of Grievances

According to Biddulph, Florida's initiative process impermissibly infringes his First Amendment right "to petition the government for redress of grievances," applicable to the states through the Fourteenth Amendment. U.S. Const. amend. I. Biddulph cites only two right-to-petition cases in his brief, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). These cases hold that the Petition Clause protects people's rights to make their wishes and interests known to government representatives in the legislature, judiciary, and executive branches. *Noerr Motor Freight, Inc.,* 365 U.S. at 138-41, 81 S.Ct. at 530-31, *Trucking Unlimited,* 404 U.S. at 508-12, 92 S.Ct. at 611-12. *See also McDonald v. Smith,* 472 U.S. 479, 481, 105 S.Ct. 2787, 2789, 86 L.Ed.2d 384 (1985) (noting that James Madison in congressional debate on petition clause made clear that people have the right to communicate their will through direct petitions to the legislature and government officials). Biddulph's cursory reference to these two cases, however, does not explain the relevance to the voter initiative processes of the right to make wishes known to government representatives. After all, in the initiative process people do not seek to make wishes known to government representatives but instead to enact change by bypassing their representatives altogether. We are aware of no case that has held that state initiative regulations implicate the "right to petition the government for redress of grievances." Moreover,

scholarship on the issue explains that state initiative processes do not involve the sort of petitioning that is guaranteed by the Petition Clause.[4]  We need not reach this issue here, however, because Biddulph has not relied on Petition Clause case law in any substantive way in making his arguments to this court;  to the contrary, Biddulph acknowledges that the right to propose legislation through initiative is state-created.[5]

---

[4]*See* Emily Calhoun, "Initiative Petition Reforms and the First Amendment," 66 U.Colo.L.Rev. 129 (1995) (arguing that Madison's version of the petition right preserved direct access to government but gave representatives ultimate power to reject petitions on the theory that representatives have to exercise judgment on behalf of the common good, not factions, even if those factions constitute a majority);  *see also* Norman B. Smith, " "Shall Make No Law Abridging ...':  An Analysis of the Neglected, But Nearly Absolute, Right of Petition," 54 U.Cin.L.Rev. 1153, 1154 (1986) (noting that interests served by petition right are keeping government informed of peoples' needs and of peoples' reaction to government actions);  Stephen A. Higginson, Note, "A Short History of the Right to Petition the Government For the Redress of Grievances," 96 Yale L.J. 142, 156 (1986) (explaining that in drafting Bill of Rights, Congress defeated amendment giving people the right to instruct their representatives but in doing so expressly affirmed Congress' duty to consider citizen communications, like petitions).

[5]In *Delgado v. Smith,* 861 F.2d 1489 (11th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989) (Fay, J.), a panel of this circuit in dicta appears to have approved of a district court's statement that initiative "petitions represent the exercise of individuals of their fundamental rights to express themselves freely and to petition the government for redress of grievances...." *Id.* at 1498-99. This statement, quoted in passing and not necessary or even relevant to the panel's decision in the case (as discussed *infra* ), does not constitute a holding of this court.

> Biddulph acknowledges that the right to propose legislation by citizen initiative is not guaranteed by the United States Constitution but is a state-created right. Thus, the sort of petitioning occurring in the citizen initiative is not guaranteed by the petition clause in the first place.  This alone should indicate that the guarantee found in the Petition Clause is not implicated by the regulation of a citizen initiative.

Biddulph's constitutional claim is best construed as based upon freedom of speech. Biddulph relies primarily on *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), and *Delgado v. Smith,* 861 F.2d 1489 (11th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989), for the proposition that once states establish a citizen initiative process, the right to advocate for political change through the process is protected by the Petition Clause. Neither case refers to the Petition Clause. *Meyer* and *Delgado* involve only the First Amendment's proscription against laws abridging freedom of speech. Because Biddulph's claim is similar to the free-speech claims addressed in *Delgado* and *Meyer,* and because it does not implicate the Petition Clause, we will construe it as a free-speech claim.

D. Freedom of Speech and State Initiative Mechanisms

Biddulph's substantive argument is that *Meyer* and *Delgado* stand for the proposition that statutes burdening the right of voters to invoke the initiative process impinge upon core political speech and therefore are subject to strict First Amendment scrutiny. Neither case, however, requires us to subject a state's initiative process to heightened First Amendment scrutiny simply because the process is burdensome to initiative proposal sponsors. The cases do say that heightened First Amendment scrutiny should be applied to certain state regulations of ballot initiatives, but they distinguish between regulation of the circulation of petitions—which is "core political speech"—and a state's general initiative regulations, the type Biddulph is contesting.

1. *Meyer v. Grant*

In *Meyer,* proponents of an initiative proposal challenged a Colorado law making it a felony to pay initiative petition circulators. The Court agreed with Colorado that the right to place a citizen initiative proposal on the ballot is a state-created right (and thus, by implication, not a right guaranteed by the First Amendment). *Meyer,* 486 U.S. at 423, 108 S.Ct. at 1893. Nevertheless, the Court determined that the circulation of initiative petitions and the concomitant exchange of political ideas constitutes "core political speech." *Id.* at 422, 108 S.Ct. at 1892. The *Meyer* Court then applied strict scrutiny to the Colorado law and concluded that in criminalizing professional petition circulation Colorado had impermissibly hindered citizens' exchange of ideas about political change without sufficient justification. *Id.* at 422-28, 108 S.Ct. at 1892-95.

The *Meyer* Court did not examine Colorado's initiative process as such. Rather, the Court indicated that a state, though generally free to regulate its own initiative process, is limited in the extent to which it can permissibly burden the communication of ideas about the political change at issue in an initiative proposal that occurs during petition circulation. *Id.* at 423-27, 108 S.Ct. at 1893-94.[6] Biddulph does not complain that exclusion of his initiative proposal limited discussion during petition

_____

[6]Colorado argued that because the power to present amendments through voter initiative is a state-created right and not a federal right, the state could freely impose limitations on the exercise of that right. *Id.* at 423, 108 S.Ct. at 1893. The Court rejected this argument, however, reasoning that the power to ban initiatives entirely (and therefore, by analogy, to regulate them) does not include "the power to limit discussion of political issues raised in initiative petitions." *Id.*

circulation of whether there should be voter approval of new taxes.[7]  Instead, Biddulph protests the burdens of an unpredictable state initiative process on his ability to get an initiative proposal on the ballot.  But *Meyer* does not require us to subject a state's initiative process to strict scrutiny in order to ensure that the process be the most efficient or affordable.  Absent some showing that the initiative process substantially restricts political discussion of the issue Biddulph is seeking to put on the ballot, *Meyer* is inapplicable.

2. *Delgado v. Smith*

In *Delgado v. Smith,* 861 F.2d 1489 (11th Cir.1988), Spanish-speaking voters sought to enjoin Florida from placing on the ballot an initiative proposal to make English the official state language.  The plaintiffs argued that the proposal's sponsors failed to comply with a provision of the Voting Rights Act requiring that certain jurisdictions subject to rules prohibiting discrimination against language minorities provide "materials or information relating to the electoral process" in the minority group's language as well as English.  861 F.2d at 1491 (citing 42

---

[7]The *Meyer* Court noted that the Colorado measure at issue there burdened political speech partly by making "it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 422, 108 S.Ct. at 1892.  Although this language out of context might suggest that strict scrutiny be applied to statutes burdening a sponsor's ability to place a measure on the ballot, *Meyer,* read as a whole, does not lead to that conclusion;  the Court established an explicit distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process.  The Court only addressed the constitutionality of the latter. *See* discussion *supra* at n. 6.

U.S.C.A. § 1973aa-1a(c) (1981 & Supp.1988)).  Six Florida counties were subject to this provision of the Act.  The initiative sponsors failed to circulate both English and Spanish copies of the petition in Florida counties covered by the provision.  The *Delgado* court concluded that Congress had not intended the Voting Rights Act's two-language requirement to govern Florida's initiative petition circulation process.  *Id.* at 1492-93.  Consequently, the court did not rely on any First Amendment ground in arriving at its decision.

The *Delgado* court went on to say in dicta, however, that "serious First Amendment questions ... would be raised" if the court were to adopt the appellants' view that the Voting Rights Act's minority language provisions applied to Florida's initiative petition circulation process.  *Meyer* 's characterization of initiative petition circulation as "core political speech" counseled caution before imposing a federal requirement on petition circulation.  *Id.* at 1495.

The *Delgado* court wrote, "[A]ny degree of governmental hindrance upon the freedom of a given group of citizens to pursue the initiative petition process with whomever, and concerning whatever they choose must be viewed with some suspicion." *Id.* at 1494.  The *Delgado* court did not, however, address the constitutionality of what it called the state's "mechanism of initiative petition." *Id.*  Instead, the court was concerned with the possibility that federal regulation of the petition circulation involved in the process might impinge upon the initiative supporters' freedom of speech and political association.  The "governmental hindrance" referred to in *Delgado* is not the state's

regulation of its initiative process in general but rather burdens on the petition circulation aspect of that process in particular.[8]

Biddulph mistakenly focuses on the following language in *Delgado:* "The state cannot impede or diminish [the initiative]

_____

[8]*Delgado* also cited *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), for the proposition that the rights of free speech and association are implicated where state statutes impose restrictions on private political activity. Neither of these cases would mandate application of strict scrutiny in this case, however.

In *Williams* the Supreme Court struck down as violative of equal protection an Ohio statute which required any new political party seeking a position on the ballot in a presidential election to obtain petitions signed by 15% of the qualified electors who voted in the last gubernatorial election. The statute at issue in that case was flawed because it infringed both First Amendment and equal protection rights. The Court characterized the Ohio statute as a severe restriction that favored the two established political parties over new parties struggling for existence. 393 U.S. at 31, 89 S.Ct. at 10. Accordingly, the Court held that the state failed to show any compelling interest for placing such an unequal burden on minority groups where important First Amendment rights were at stake. *Id.* at 31, 89 S.Ct. at 11. In contrast, Biddulph does not allege that Florida's initiative process discriminated against or even disparately impacted a minority party or political view.

In *Tashjian,* the Court struck down a Connecticut statute that required voters to be registered members of a party in order to vote in that party's primary. The Connecticut Republican Party had declared its primary open to independent voters. The Supreme Court held that the statute burdened the Connecticut Republican Party's right to associate with others for political ends and applied strict scrutiny. 479 U.S. at 217-29, 107 S.Ct. at 550-56. The statute at issue in *Tashjian* directly burdened the First Amendment rights of individuals to associate for political purposes. The regulations at issue here, in contrast, have no such direct effect on political association.

The types of association and equal protection rights infringed by the statutes at issue in *Williams* and *Tashjian* are not raised by Biddulph's claim. Were these rights directly burdened, strict scrutiny indeed might apply.

process so long as it reserves the right of initiative to the people." *Id.* at 1496 (citing *Meyer,* 426 U.S. at 424, 108 S.Ct. at 1893). This language only makes sense in the context in which it was written, though. The quoted sentence is not from the portion of the opinion addressing the possible First Amendment implications of applying the Voting Rights Act to initiative petition circulation. Rather, the court uses this language in a section in which it describes Florida's initiative regulations as "limited ministerial duties." The court reasoned in this section that Florida's limited role in writing and circulating petitions indicated that, in Florida, petition circulation was a private political action rather than a state action. As a result, the petition materials were not "provided" by the state and, therefore, were not subject to the two-language requirement of the Voting Rights Act. This has nothing to do with the free speech implications of the state initiative mechanism.

That the *Delgado* court did not mean to impose First Amendment limitations on how Florida structured its initiative scheme is evidenced by the fact that the court explicitly recognized that Florida did impose regulations on its initiative process; in fact, the court noted most of the regulations which are discussed in Part II of this opinion. *Delgado,* 861 F.2d at 1496. The court also recognized the legitimate purpose served by Florida's initiative regulations: "The state's responsibility is to ensure that the petition meets the requirements of law and will fairly present the proposition that may or may not be placed before the electorate." *Id.* at 1497. The court also stated, "The state's sole concern is

a fair presentation on the *ballot* in accordance with state law." *Id.* at 1498 (emphasis in original).

*Delgado* simply stands for the proposition that a state cannot impede the petition circulation process as Colorado did in *Meyer* or as the two-language requirement might have in *Delgado* itself. As the *Delgado* court characterized *Meyer,* "The United States Supreme Court recognized that circulation of a petition involves activity protected as core political speech. *Meyer, supra,* 426 U.S. at 422, 108 S.Ct. at 1892." *Delgado,* 861 F.2d at 1498. *Delgado* cannot be read to mandate heightened First Amendment scrutiny of every restriction a state places on its own initiative process.

3. Strict Scrutiny and a State's Initiative Process

*Meyer* and *Delgado* represent constitutional limitations on the generally broad power of states to institute procedures governing their own initiative processes—should they choose to create such processes in the first place. Nevertheless, as we have made clear, states maintain broad discretion in fashioning initiative mechanisms:

> The rights [to place an initiative on the ballot] derive from wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace. The state, having created such a procedure, retains the authority to interpret its scope and availability. Clearly, appellants can claim no constitutionally-protected right to place issues before the Florida electorate; any opportunity to do so must be subject to compliance with state constitutional requirements.

*Gibson v. Firestone,* 741 F.2d 1268, 1273 (11th Cir.1984), (rejecting initiative sponsors' arguments that Florida court proceeding excluding initiative proposal from ballot was in violation of sponsors' voting, due process, equal protection, and

contract rights), *cert. denied,* 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 367 (1985).

We hold that a state's broad discretion in administering its initiative process is subject to strict scrutiny only in certain narrow circumstances. We obviously would be concerned about free speech and freedom-of-association rights were a state to enact initiative regulations that were content based or had a disparate impact on certain political viewpoints. We also would be troubled were a state to apply facially neutral regulations in a discriminatory manner. *See Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291, 297 (6th Cir.1993) (holding that the First Amendment Free Speech Clause does not constrain a state's ability to regulate its own initiative process as long as the state does not elect or enforce initiative procedures in a discriminatory or content-based manner). Nor, as *Meyer* held, could a state impermissibly burden the free exchange of ideas about the objective of an initiative proposal.[9] Most restrictions a state might impose on its initiative process would not implicate First Amendment concerns.

The restriction at issue in this case is not subject to strict scrutiny. Biddulph does not contend that Florida's procedures

---

[9]The Supreme Court has applied strict scrutiny to at least two other state statutes that impermissibly burdened speech about changes at issue in referendum elections. *See McIntyre v. Ohio Elections Comm'n,* --- U.S. ----, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (holding Ohio statute that prohibits the distribution of anonymous campaign literature unconstitutional); *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (holding statute prohibiting corporations from making contributions or expenditures for the purpose of affecting referendum elections unconstitutional).

disparately impact a particular viewpoint or are content-based. He does not argue that Florida discriminatorily applied its initiative regulations. Nor does he complain that the state burdened the exchange of ideas with respect to the objective of his initiative proposal. Rather, Biddulph solely contends that Florida's process is burdensome because it is unpredictable and imposes unnecessary costs on initiative sponsors. [10] But the Constitution does not require Florida to structure its initiative process in the most efficient, user-friendly way possible. The facts and arguments presented here do not require us to apply strict First Amendment scrutiny to Florida's initiative process.

### V. Conclusion

Although there are some scenarios in which a First Amendment challenge seeking strict scrutiny of a state's initiative process would survive a motion to dismiss, Biddulph has failed to make out such a viable claim.

AFFIRMED.[11]

---

[10]Biddulph has not requested that we weigh state interests against the voters' burden—the case-by-case balancing test called for by the Supreme Court in the ballot access cases. *See Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). That test is not appropriate here. Unlike the petitioners in *Celebrezze* and *Takushi,* Biddulph has not raised a right-to-vote or freedom-of-association claim. Additionally, this case involves an initiative's access to the ballot, not a candidate's. This difference is material because, as noted earlier, the right to place an initiative on the ballot is a right created by the state.

[11]Appellant's request for oral argument is denied. Appellee's "Suggestion of Mootness," construed as a motion to dismiss this case as moot, is denied.