*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 46**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

MERRILL COOK, PAUL BRUGGER, and MARA BRENENSTALL,
*Appellants,*

*v.*

LT. GOVERNOR GREG BELL and SALT LAKE COUNTY CLERK'S OFFICE,
*Appellees.*

No. 20120748
Filed October 24, 2014

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 120904608

Attorneys:

Merrill Cook, Paul Brugger, Mara Brenenstall,
appellants pro se

Sean D. Reyes, Att'y Gen., Thom D. Roberts,
Asst. Att'y Gen., Melanie F. Mitchell, Salt Lake City,
for appellees

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
and JUSTICE PARRISH concur.

JUSTICE LEE filed an opinion concurring in the judgment.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1 During the 2011 legislative session, the Utah legislature passed Senate Bill 165 (S.B. 165), altering the requirements for placing an initiative on the ballot. After an unsuccessful attempt to place a local initiative on the ballot, the sponsors of the initiative challenged several provisions of S.B. 165, contending the amendments violate the right to initiative and uniform operation of laws provisions of the Utah Constitution and the Free Speech Clause of the federal Constitution. The district court found that the amendments did not violate any of these constitutional provisions. We affirm.

## BACKGROUND

¶2 Appellants Mara Brenenstall, Paul Brugger, and Merrill Cook (collectively, initiative proponents) are sponsors of an initiative petition entitled "Lawful Employment Ordinance," which would require Salt Lake County employers to comply with an "E-verify" requirement aimed at preserving jobs in Utah for legal residents. After unsuccessful attempts by the initiative proponents to secure the necessary support from the legislature, he sought to place the ordinance on the 2012 general election ballot in Salt Lake County. The initiative proponents filed an initiative application with the Salt Lake County Clerk's Office in June 2011, and used volunteers to collect signatures through April 2012. The county clerk, however, determined that there were not enough signatures to place the Lawful Employment Ordinance on the 2012 general election ballot.

¶3 Several months before the initiative proponents filed the application for petition, the state legislature modified the requirements for placing a local initiative on the ballot. Alleging that these amendments resulted in his inability to get enough signatures to place the Lawful Employment Ordinance on the 2012 ballot, the initiative proponents filed a lawsuit against Lieutenant Governor Greg Bell and Salt Lake County Clerk Sherrie Swenson (collectively, the State), seeking a declaration that two of these amended provisions were unconstitutional.

¶4 The initiative proponents' first challenge was to the number of signatures required to place the initiative on the ballot. Utah Code section 20A-7-501(1)(a) was modified to require initiative sponsors to gather "signatures equal to . . . 10% of all the votes cast in the county, city, or town for all candidates for President of the United States at the last election at which a President of the United States was elected," rather than an equal percentage of votes cast in Utah's most recent gubernatorial election as previous iterations of the law required. 2011 Utah Laws 215. The initiative proponents claimed that the 2011 amendment unconstitutionally increased the number of required signatures in Salt Lake County from approximately twenty-three thousand to approximately thirty-nine thousand.

¶5 Second, the initiative proponents challenged the amended provision requiring initiative sponsors to consign the completed initiative packet and sufficient signatures to the county clerk's office by "the sooner of . . . (A) 316 days after the day on which the application is filed; or (B) the April 15 immediately before the next

regular general election immediately after the application is filed." UTAH CODE § 20A-7-506(1)(a). Prior to the 2011 amendment, proponents of statewide initiatives had one year after filing an application to gather the required signatures, while proponents of local initiatives had an unlimited amount of time to gather signatures so long as they were submitted to the county clerk's office by April 15 of the year in which the initiative was to go on the ballot. UTAH CODE §§ 20A-7-202(4)(a), 20A-7-506(1) (2010). The 2011 amendments standardized these diverse timetables, requiring both statewide and local initiative sponsors to gather the required number of signatures by the sooner of (a) 316 days after filing an application or (b) the April 15 immediately before the next regular general election. UTAH CODE §§ 20A-7-206(1)(a), 20A-7-506(1)(a).

¶6    On cross-motions for summary judgment, the district court denied the initiative proponents' declaratory relief claims. The initiative proponents appealed, challenging the constitutionality of the 2011 amendments to the local initiative requirements.

## STANDARD OF REVIEW

¶7    "Because the issue of constitutionality presents a question of law, we review the trial court's ruling for correctness and accord it no particular deference." *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 424 (Utah 1995) (internal quotation marks omitted).

## ANALYSIS

¶8    The initiative proponents assert that the 2011 amendments to the local initiative requirements are unconstitutional on three separate grounds: first, the challenged provisions violate the fundamental right to initiative granted under article VI, section 1 of the Utah Constitution; second, the provisions violate the uniform operation of laws under article I, section 24 of the Utah Constitution; and finally, the provisions unconstitutionally infringe upon the right to free speech under the First Amendment to the U.S. Constitution. We disagree with these assertions.

## I. THE RIGHT TO INITIATIVE

¶9    Article VI, section 1 of the Utah Constitution establishes the right of voters to legislate via local initiatives:

> The legal voters of any county, city, or town, in the numbers, under the conditions, in the manner, and within the time provided by statute, may . . . initiate any desired legislation and cause it to be submitted to the people of the county, city, or town for adoption upon a

> majority vote of those voting on the legislation, as provided by statute . . . .

UTAH CONST. art. VI, § 1(2)(b). While we recognize that the "reserved right and power of initiative is a fundamental right," *Gallivan v. Walker*, 2002 UT 89, ¶ 24, 54 P.3d 1069, it "is not unfettered, but comes with a built-in limitation," *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 28, 94 P.3d 217. The constitutional provision establishing the right to initiative also qualifies that right by granting the legislature power to regulate "the numbers, . . . the conditions, . . . the manner, and . . . the time" by which initiatives may be placed on the ballot. UTAH CONST. art. VI, § 1(2)(b).

¶10 Thus, although the legislature is precluded from passing laws that "unduly burden or diminish the people's right to initiate legislation," *Gallivan*, 2002 UT 89, ¶ 28, "[t]his does not mean . . . that the legislature may never pass regulations that have the effect of making it more difficult to enact legislation by initiative," *Safe to Learn*, 2004 UT 32, ¶ 29. Statutory regulations of the right to initiative are unconstitutional only if they are unduly burdensome. *Id*. 34–5.

¶11 The initiative proponents point to the language in the district court's opinion that recognizes "there is a point at which the ratcheting up of required signatures and ratcheting down of time in which to gather those signatures reaches a point where few or no citizen's group could meet the criteria." In connection with this language, the initiative proponents argue for an interpretation of "unduly burdensome" that triggers a constitutional violation whenever a law has the effect of actually preventing a party from reaching the ballot with a specific initiative. They further note that while the lower court has found each provision of the 2011 amendments to be constitutional, individually permissible restrictions can become unduly burdensome when considering their combined effect.

¶12 As noted above, the right to initiative in Utah is a qualified right, subject to legislative regulation. Thus, while residents of Utah may not be statutorily deprived of the right to initiative, the legislature does possess the power to define the boundaries surrounding its practice, which may have the effect of rendering the ballot-initiative process more difficult. However, increasingly stringent requirements may, individually or in the aggregate, rise to an unconstitutional level if they unduly burden the right of Utah's citizens to initiate legislation. *See Gallivan,* 2002 UT 89, ¶ 27. To avoid this danger, courts weigh the burdens placed on initiative proponents against the legislature's purpose in enacting the

regulations to determine whether an enactment unduly burdens the right to initiative. As we stated in *Safe to Learn*:

> In making this determination, a court should assess whether the enactment is reasonable, whether it has a legitimate legislative purpose, and whether the enactment reasonably tends to further that legislative purpose. In evaluating the reasonableness of the challenged enactment and its relation to the legislative purpose, courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose.

2004 UT 32, ¶ 35.

### A. Reasonableness

¶13    When considering the reasonableness of a statutory provision, we assess both the type and the magnitude of the restriction in burdening the right to initiative. The Utah Constitution explicitly permits the legislature to impose four types of regulations on the right to initiative, namely, regulations that determine "the numbers, . . . the conditions, . . . the manner, and . . . the time" whereby legislation may be initiated by direct vote of the people. UTAH CONST. art. VI, § 1(2)(b). Reasonable regulations falling within the above four categories have generally been upheld as constitutional.

¶14    For example, a statute defining the *number* of signatures required was upheld by this court where sponsors were required to gather ten percent of the number of votes cast in twenty-six of Utah's senatorial districts in the most recent gubernatorial election. *Safe to Learn*, 2004 UT 32, ¶ 43.

¶15    Similarly, provisions regulating the *manner* of obtaining signatures have been upheld as reasonable where petition sponsors were limited to utilizing state residents to collect signatures, *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001), where sponsors were prohibited from paying circulators a commission for each signature obtained, *id.* at 618, where circulators were required to be of legal voting age, *Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1101 (10th Cir. 1997), and where circulators were required to sign affidavits of compliance prior to circulating, *id.* at 1106.

¶16    Statutory *conditions* found to permissibly regulate the right to initiative include requiring a quantity of signatures from an established number of elective regions within a state, *Safe to Learn*,

2004 UT 32, ¶ 43, establishing a process whereby initiative signers may remove their name and support from the initiative, *id.* ¶¶ 44, 49, limiting each initiative to a single subject, *PEST Comm. v. Miller*, 626 F.3d 1097, 1107–08 (9th Cir. 2010), requiring a description of the effect of the initiative to appear on the initiative, *id.*, and requiring the subject of the initiative to appear in its title, *Campbell v. Buckley*, 203 F.3d 738, 746–747 (10th Cir. 2000).

¶17 This court has upheld a statute providing a one-year allotment of *time* within which signatures must be gathered, noting that prior initiative sponsors have qualified for the ballot within six weeks to five months. *Safe to Learn*, 2004 UT 32, ¶¶ 51–52.

¶18 Much of the jurisprudence in this area has proceeded on a case-by-case categorical analysis of whether a specific type of restriction is unduly burdensome. But any restriction may on its own, or in connection with other requirements, rise to the level of being an undue burden if legislative requirements vis-à-vis the number, manner, condition, or time are unreasonably restrictive. In contemplating the quantitative level at which restrictions cross the threshold from constitutional regulation to an unconstitutional abrogation of the fundamental right to initiative, courts consider the qualitative net effect of all the relevant statutory restrictions. Whereas in isolation a provision may not rise to the level of being unduly burdensome, the combined effect of multiple, otherwise permissible, provisions may cross that threshold.

¶19 This case presents a series of statutes that require local initiative proponents to collect signatures equal to ten percent of the votes cast in the most recent presidential election by April 15 of the election year or within 316 days, whichever occurs first. These provisions establish the number of signatures required and the time frame within which they must be gathered, both of which are within the enumerated restrictions the state legislature may impose upon the right to initiative. UTAH CONST. art. VI, § 1(2)(b).

¶20 As to the numbers requirement of the amended local initiative statute, it retained the ten-percent-of-votes-cast threshold but changed the referenced office from the previous gubernatorial election to the previous presidential election. In order to assess whether the amended statute unreasonably increases the number of signatures required, we therefore would need to evaluate historical evidence of the number of votes cast for each of these offices in previous elections. But the initiative proponents do not cite any record evidence of the number of votes cast in prior elections, nor have we uncovered such evidence from our independent review of

the record. In its ruling on the cross-motions for summary judgment, the district court noted that the initiative proponents claimed that the amended statute increased the number of signatures required from approximately twenty-three thousand to approximately thirty-nine thousand. Absent any record evidence, however, we cannot evaluate this claim. Nor can we determine whether any variance in the number of signatures required was entirely due to the fact that Utah had recently held its first special gubernatorial election outside of the presidential election cycle, which might have led to an artificially low number of votes cast in the previous gubernatorial race.

¶21    Without any evidence of the practical effect of the amendment, we are left with only the language of the statute. And on its face, we cannot say that requiring signatures equal to ten percent of the votes cast in the previous presidential election rather than ten percent of the votes cast in the prior gubernatorial election amounts to a per se unreasonable restriction on the right to initiative.

¶22    We next examine whether the shortened time requirement imposed by the amended statute unreasonably burdens citizens seeking to place an initiative on the ballot. Although the amended provisions require circulators to collect the required signatures in forty-nine fewer days than we found to be appropriate in *Safe to Learn*, there is no evidence that the time restriction amounts to an undue burden. The Tenth Circuit, in ruling on a restriction limiting the duration of initiative petition drives to six months, held that while "some measures might fare better under a longer or indeterminate period, the current deadline [of six months] is not a significant burden on the ability of organized proponents to place a measure on the ballot." *Am. Constitutional Law Found.*, 120 F.3d at 1099. Further, there is no evidence that the initiative proponents' failure to acquire sufficient signatures via an unsponsored and volunteer-driven petition circulation signifies that *no* unsponsored and volunteer-driven petition would be able to succeed. Rather, it is possible that the Legal Employment Ordinance simply did not enjoy much popular support. Again, the record contains no evidence on this subject.

¶23    The initiative proponents further argue that the statute has the effect of forcing initiative circulators to gather most of their signatures during the oppressive winter months, especially at the end of the drive where the momentum should be the greatest. However, a careful reading of the statute demonstrates that initiative

sponsors may select any 316-day period within the two years prior to the April 15 preceding the election. *See* UTAH CODE § 20A-7-506(1)(a). Thus, an initiative sponsor may file an application on January 1, receive the approval and packets in February, and have the warm weather of April through October to collect signatures and gather momentum.

¶24 We hold, therefore, that the burdens imposed by the amendments to Utah's initiative process—either individually or in the aggregate—are not unreasonable restrictions under article VI, section 1 of the Utah Constitution.

### B. Legitimate Legislative Purpose

¶25 We now consider whether an improper legislative purpose in passing the 2011 amendments may void the challenged provisions. Generally, "[t]he authority of the legislature . . . . is limited . . . to the role of providing for the orderly and reasonable use of the initiative power." *Sevier Power Co. v. Bd. of Sevier Cnty. Comm'rs*, 2008 UT 72, ¶ 10, 196 P.3d 583. Legitimate legislative purposes include "deterring fraud, ensuring the efficiency of the process, [and] ensuring a modicum of numerical support for an initiative." *Gallivan*, 2002 UT 89, ¶ 53. "The legislature may not, however, impose discriminatory restrictions on the initiative right . . . simply for the sake of making it harder to [place an initiative on the ballot] and restricting the initiative power." *Id.*

¶26 No showing of such an illegitimate legislative purpose has been made here. As the State notes in its briefing, Utah had held a special interim election to replace Governor Huntsman, who had recently been appointed as United States Ambassador to China. The State claims that as a result of this irregular occurrence, and under the prior iteration of section 20A of the Utah Code, a significantly reduced number of signatures would have been required in 2011 for an initiative to reach the ballot than in prior years. It is reasonable to conclude that the legislature, interested in providing for the orderly and reasonable use of the initiative power, acted to maintain a comparable standard of numerical support by which initiatives might reach the ballot during this period. This is a legitimate legislative purpose.

¶27 In weighing the reasonableness of the burdens placed upon the initiative right against the legislative purpose for the restrictions, we conclude that the challenged provisions are reasonable, both individually and in the aggregate, and are supported by a legitimate legislative purpose. These provisions reasonably serve to maintain a consistent threshold of minimal support required before legislation

may be placed on the ballot via initiative, promoting an efficient and orderly initiative process. We therefore hold that the challenged provisions do not unduly burden the right to initiative.

## II. UNIFORM OPERATION OF LAWS

¶28 The initiative proponents argue that legislation reducing the number of days to gather signatures and (allegedly) increasing the number of signatures required disadvantages volunteer citizen groups. They assert that these regulations favor well-funded initiative efforts, which can hire signature gatherers, over unfunded initiatives, which rely exclusively on volunteer signature gatherers. The initiative proponents contend this disparate impact violates the uniform operation of laws provision of the Utah Constitution.

¶29 Article I, section 24 of the Utah Constitution guarantees that "[a]ll laws of a general nature shall have uniform operation." UTAH CONST. art. I, § 24. Under this language, "a statutory provision may be unconstitutional if it creates a classification that is discriminatory; that is, if it creates a classification that treats the members of the class or subclasses disparately." *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 31, 94 P.3d 217 (internal quotation marks omitted). Further, under the Utah Constitution, a statute may be held unconstitutional both on its face and for any de facto disparate effects on similarly situated parties. *Lee v. Gaufin*, 867 P.2d 572, 577 (Utah 1993) ("For a law to be constitutional under [a]rticle I, section 24, it is not enough that it be uniform on its face. What is critical is that the *operation* of the law be uniform. A law does not operate uniformly if persons similarly situated are not treated similarly . . . ." (internal quotation marks omitted)).

¶30 Violations of the uniform operation of laws clause may trigger varying degrees of scrutiny. *Safe to Learn*, 2004 UT 32, ¶ 31. The level of scrutiny applied turns on whether "a legislative enactment implicates a fundamental or critical right or creates classifications which are considered impermissible or suspect in the abstract." *Gallivan v. Walker*, 2002 UT 89, ¶ 40, 54 P.3d 1069 (internal quotation marks omitted). Where a statutory provision creates an impermissible classification, heightened scrutiny is appropriate. *See id*.

¶31 We decline to recognize the inability to employ paid circulators as defining a constitutionally significant classification. In *Safe to Learn*, appellants challenged a statute requiring all ballot initiatives to receive ten percent of votes cast in the prior gubernatorial election in twenty-six of Utah's twenty-nine senatorial

districts within one year of filing an application. 2004 UT 32, ¶ 4. Although the contested requirements necessitated an increased amount of organization, labor, and money to gather signatures across the entire state, we concluded that neither the senatorial district requirement, nor the one-year requirement, created any classifications, "but appl[ied] equally to all Utah citizens." *Id.* ¶ 33. A similar logic applies here. Although the strictures of the statutory provisions may render the initiative process more accessible to those with greater resources, they apply uniformly to all citizens and do not violate article I, section 24 of the Utah Constitution.

## III. FREEDOM OF SPEECH

¶32 The initiative proponents argue that the challenged provisions violate their right to "core political expression" as protected by the First Amendment's guarantee of free speech. In essence, the initiative proponents assert that Utah's initiative regulations improperly hinder their ability to express their political message by means of a ballot initiative. We disagree.

¶33 Numerous cases adjudicated by this court and federal courts have repeatedly distinguished between regulation of the initiative process and discouraging or preventing speech regarding the subject of the initiative. *See, e.g.*, *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶¶ 56–57, 94 P.3d 217 (distinguishing statutes that violate the First Amendment by limiting speech from statutes that constitutionally limit the success of initiative petitions via procedural restrictions); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) ("[T]he First Amendment protects political speech incident to an initiative campaign," but not "the right to make law[] by initiative."); *Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1211 (10th Cir. 2002) ("[T]he right to free speech . . . [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure . . . ."); *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir. 1996) (initiative proponent's desire to place an initiative on the ballot not protected by the First Amendment because removing the initiative from the ballot did "not prevent[] [the proponent] from speaking on any subject"); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 960 (4th Cir. 1993) ("The First Amendment guarantees the right to participate in the political process. It does not guarantee political success.").

¶34 In *Safe to Learn*, an initiative proponent raised a First Amendment claim similar to the claim in this case. There, the initiative proponent argued that the legislature's limits on the right

to initiative "impose[d] severe restrictions upon rights of free speech and political expression, and thus [were] subject to strict scrutiny under federal free speech analysis." 2004 UT 32, ¶ 53 (internal quotation marks omitted). This court held that

> the provisions of the initiative statute d[id] nothing to restrict speech. Initiative proponents [were] free, and even encouraged, to disseminate their message throughout the state. Nothing in the initiative statute serve[d] to limit the number of messengers available to engage in this sort of political expression. While the regulations may arguably [have made] it more difficult to place an initiative on the ballot, nothing . . . suggest[s] that there is a protected right to have a particular initiative on the ballot.

*Id.* ¶ 57 (fifth and sixth alterations in original) (internal quotation marks omitted). We affirm our ruling in *Safe to Learn*, holding that core political expression, as protected by the First Amendment, distinguishes political expression from political activity. *See id.* ¶¶ 56–57. Under the 2011 amendments, the initiative proponents were free to print posters, hold rallies, demonstrate, discuss, canvass, campaign, and raise awareness for an E-verify requirement initiative before, during, and after the statutory 316-day period. First Amendment jurisprudence in this case does not guarantee unlimited participation in political activity, nor does it establish a right to political success. Rather, it protects individuals from regulations that directly discourage or prohibit political expression.

¶35 We therefore find no First Amendment violation in the March 2011 amendments challenged by the initiative proponents.

## CONCLUSION

¶36 We hold that the challenged amendments contained in S.B. 165 do not violate the Utah Constitution's guarantees of the right of the people to initiate legislation or of the uniform operation of the law. Further, the provisions do not violate the federal First Amendment. Thus, we affirm the judgment of the district court.

————————

JUSTICE LEE, concurring in the judgment:

¶37 I concur in the court's judgment upholding the constitutionality of the ballot initiative amendments adopted in Senate Bill 165. But I disagree with the standard set forth in the

majority opinion and write separately to articulate the standard that I would apply.

¶38    The controlling constitutional provision at issue here is unusual. It prescribes *both* a right to an initiative *and* a legislative power to regulate the exercise of that right. Thus, under article VI section 1 of the Utah Constitution, our citizens have a right to "initiate any desired legislation," but the legislature also possesses the express authority to regulate the "numbers," "conditions," "manner," and "time" for placement of initiatives on the ballot. UTAH CONST. art. VI, § 1(2)(b). We must honor both provisions. To do so, in my view, we must (1) vigorously protect the individual right to "initiate any desired legislation," by upholding ballot access for any initiatives plausibly within the legislative power as defined in *Carter v. Lehi City*, 2012 UT 2, 269 P.3d 141; and also (2) defer to the legislature's exercise of its delegated authority to regulate as to numbers, conditions, manner, and time.

¶39    To reconcile these two mandates, I would defer to the legislature's regulation of the initiative process *except* in circumstances where such regulation forecloses any meaningful possibility for the people to exercise the power reserved to them in article VI, section 1. In other words, in my view we should yield broad deference to the legislature to determine how best to regulate the initiative process (as to numbers, conditions, manner, and time). But that deference should yield to the right of the people to initiate desired legislation in circumstances where the legislature's regulation forecloses any meaningful channels for the actual vindication of the people's reserved power.

¶40    This standard seems to me to follow from the twofold structure of article VI, section 1. By generally deferring to the legislature, we respect the constitution's express reservation of legislative power. And by withholding deference in cases where the legislature's regulation blocks the people's access to meaningful channels for exercising their reserved power, we also respect the constitutional reservation of this right.

¶41    The standard applied by the majority seems to me to be incompatible with the text and structure of article VI, section 1. In light of the express reservation of *the legislature's* prerogative of regulating the *initiative process*, I cannot see how *the courts* can assert the authority to (a) assess the extent of any "undue burden" imposed by the legislature's regulation of the initiative process, (b) evaluate whether any legislative regulation is "reasonable" or "reasonably" advances a legislative purpose, or (c) "weigh the extent to which the

right of initiative is burdened against the importance of the legislative purpose." *Supra* ¶¶ 10, 12, 13−24 (applying and extending the standard set forth in *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, 94 P.3d 217). As a general rule, these are questions for the legislature. Under a constitutional provision recognizing legislative authority to regulate the terms and conditions of the exercise of the initiative power, the courts are in no position to second-guess the legislature's judgments as to the weight of competing considerations, or the reasonableness of the legislature's judgments.

¶42    Again, deference to the legislature should not be absolute. But in light of the text and structure of the constitution, we cannot properly assess the legislature's judgments de novo. We should step in only in the rare circumstance in which the legislature's attempts to regulate *process* effectively abrogate the reserved right of the people to initiate desired legislation.

¶43    The majority's standard—articulated in *Safe to Learn* and extended today—appears to have been imported from state and federal equal protection and due process precedent.[1] But there are no equal protection or due process issues before us today.[2] This case

---

[1] *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (stating that "the Equal Protection Clause requires only that the classification rationally further a legitimate state interest"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 874 (1992) (adopting an "undue burden" standard for due process analysis under which "[o]nly where state regulation imposes an undue burden . . . does the power of the State reach into the heart of the liberty protected by the Due Process Clause"); *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 890 (Utah 1988) (under our state equal protection analysis, a statute is constitutional if its classification is "a reasonable one and bears a reasonable relationship to the achievement of a legitimate legislative purpose").

[2] Nor is there a basis for the court's standard in the First Amendment. Established free speech jurisprudence prescribes heightened scrutiny only for laws regulating *political speech by initiative proponents*; the First Amendment has no application to laws regulating the initiative *lawmaking process* itself. "The distinction is between laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation

(continued...)

arises exclusively under the Initiative Clause of the Utah Constitution. And that clause, as noted above, protects both the people's initiative power and the legislature's authority to regulate the initiative process.

¶44    I would apply this standard to our evaluation of this case. And I would affirm on the ground that plaintiffs have failed to present any evidence that the restrictions imposed by the legislature in the exercise of its constitutional prerogative to regulate the numbers, conditions, manner, or time for the ballot initiative process effectively precluded them from getting their initiative on the ballot. *See supra* ¶ 21 (noting that plaintiffs have not presented "any evidence of the practical effect" of the legislation in question).

---

[2] (...continued) is enacted, which do not." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099–100 (10th Cir. 2006); *see also Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1211 (10th Cir. 2002) ("[T]he right to free speech and the right to vote are not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure . . . ."); *Biddulph v. Mortham*, 89 F.3d 1491, 1497 (11th Cir. 1996) ("The cases do say that heightened First Amendment scrutiny should be applied to certain state regulations of ballot initiatives, but they distinguish between regulation of the circulation of petitions—which is 'core political speech'—and a state's general initiative regulations . . . .").