2004 UT 32

**UTAH SAFE TO LEARN–SAFE TO WORSHIP COALITION, INC. d/b/a Safe Havens for Learning, a Utah non-profit corporation, Plaintiff and Appellant,**

v.

**The STATE of Utah, a governmental entity, Olene Walker, in her official capacity as Lieutenant Governor of the State of Utah, and Mark Shurtleff, in his official capacity as Attorney General of the State of Utah, Defendants and Appellees.**

No. 20030563.

Supreme Court of Utah.

April 20, 2004.

218

220

John A. Pearce, Ryan M. Harris, Salt Lake City, Lisa Watts Baskin, North Salt Lake, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Thom D. Roberts, Asst. Att'y Gen., Salt Lake City, for defendants.

DURRANT, Associate Chief Justice:

¶ 1 For nearly a decade, certain education groups and other interested individuals have attempted to pass legislation banning guns on school premises. After numerous failed attempts to pass such legislation, both by petitioning legislators and using the initiative process, these groups now bring a constitutional challenge to the initiative statute itself. During the 2003 legislative session, the legislature amended the initiative statute by the adoption of Senate Bill 28 (S.B.28). Appellant challenges several provisions of the newly-amended initiative statute, contending that the new amendments are not retroactively applicable to its initiative or, in the alternative, that all of the challenged provisions are unconstitutional. The district court granted appellees' motion to dismiss challenges to two of the provisions and also granted appellees' cross-motion for summary judgment. We affirm.

## BACKGROUND

¶ 2 The Utah Constitution grants Utah citizens the right to initiate legislation and to submit such legislation to a vote of the people. *See* Utah Const. art. VI, § 1. The conditions and procedures by which citizens' initiatives may be placed on the ballot are governed by statute. *See* Utah Code Ann. §§ 20A–7–101 to –706 (2003). This case arises out of the efforts of numerous education groups and others to pass legislation banning guns from schools. Although the possession of a weapon on school premises was once proscribed, *see* Utah Code Ann. § 53A–3–502 (repealed 2003), a 1992 enactment of an apparently conflicting law that created an exception for persons "authorized to possess a firearm," Utah Code Ann. § 76–

10–505.5(3)(a) (2003), raised concerns among educators and others.[1]

¶ 3 For years the groups petitioned the legislature to pass legislation prohibiting concealed weapons permit holders from carrying weapons into Utah's elementary and secondary schools. In 1999, finding their efforts unsuccessful, these education groups, joined by a coalition of other interests, decided to take advantage of the initiative process. They drafted an initiative, filed it with the lieutenant governor, and began gathering signatures. At that time, however, the coalition was unable to gather the requisite number of signatures to satisfy the provision of the initiative statute then in place, which required initiative proponents to gather signatures equal to 10 percent of the votes cast for all candidates for governor in the last general election, both statewide and in twenty of twenty-nine counties. *See* Utah Code Ann. § 20A–7–201(2)(a)(ii) (1998). Three years later, the coalition again failed in an attempt to place the initiative on the 2002 ballot.

¶ 4 In 2002, this court decided *Gallivan v. Walker*, 2002 UT 89, 54 P.3d 1069, which struck down as unconstitutional the requirement that initiative proponents meet the 10 percent threshold in at least twenty of twenty-nine counties. *Id.* at ¶ 64. *Gallivan* left the statewide 10 percent requirement untouched. This meant that, post-*Gallivan*, an initiative proponent was only required to satisfy the statewide signature requirement without the necessity of reaching the 10 percent threshold within twenty or more individual counties. In response to *Gallivan*, the legislature passed S.B. 28, which effectuated a number of amendments to the initiative statute. The statutory amendments included a new signature provision, which retained the previous statewide 10 percent requirement and added a provision requiring an initiative proponent to meet the 10 percent threshold in twenty-six of twenty-nine *senate districts*, as opposed to twenty of twenty-nine *counties*. Utah Code Ann. § 20A–7–201(2)(a)(ii) (2003).

¶ 5 After the ruling in *Gallivan*, but prior to the enactment of S.B. 28, the coalition, now under the name "Safe Havens for Learning" ("Safe Havens"), filed a new initiative with the office of the lieutenant governor. Safe Havens filed its initiative on March 21, 2003, more than one month prior to the effective date of the 2003 amendments effectuated by S.B. 28.[2] The lieutenant governor approved the initiative for circulation by a letter dated April 18, 2003, at which time she also informed Safe Havens that it would be required to comply with the provisions of S.B. 28.

¶ 6 On April 30, 2003, Safe Havens filed a complaint against the State of Utah, Lieutenant Governor Olene Walker, and Attorney General Mark Shurtleff (collectively, "the State"). Safe Havens challenged five provisions of the amended initiative statute, four of which were introduced by S.B. 28 and one that existed prior to and was retained in the revised statute. Specifically, Safe Havens advanced challenges to the following requirements:

1. The "Senate District Requirement," which mandates that a "person seeking to have an initiative submitted to a vote of the people for approval or rejection shall," in addition to meeting the statewide signature requirement, "obtain ... from each of at least 26 Utah State Senate districts, legal signatures equal to 10% of the total of all votes cast in that district for all candidates for governor at the last regular general election at which a governor was elected," Utah Code Ann. § 20A–7–201(2)(a)(ii);

2. The "One–Year Requirement," which provides that sponsors must gather the requisite number of signatures to qualify the initiative within one year of the initiative application filing date, *id.* § 20A–7–202(4);

3. The "Public Meetings Requirement," which provides that sponsors must notice, hold, and document at least seven public

---

1. The legislature later remedied this apparent conflict by repealing section 53A–3–502 of the Utah Code and leaving section 76–10–505.5, with its controversial exception, in place.

2. S.B. 28 became effective on May 5, 2003. Utah Code Ann. § 20A–7–201, amendment notes.

hearings in different regions around the state before being allowed to circulate a petition for voter signatures, *id.* § 20A–7–204.1;

4. The "Same–or–Similar Ban," which forbids the lieutenant governor from accepting an initiative if it is "identical or substantially similar to" any initiative submitted within the last two years, *id.* § 20A–7–202(5)(d); and

5. The "Signature Removal Provision," which allows signatories to remove their signatures from the petition up until the time that it is "submitted to the lieutenant governor," *id.* § 20A–7–205(3).[3]

¶ 7 By a letter dated May 12, 2003, the lieutenant governor informed Safe Havens that S.B. 28 would not apply in its entirety, but that only four of the newly-enacted amendments would be applicable to Safe Havens' initiative. Among those listed were the Senate District Requirement and the One–Year Requirement. The Public Meetings Requirement and the Same–or–Similar Ban, however, were not listed as applicable provisions.

¶ 8 Safe Havens filed a motion for summary judgment on May 5, 2003. The State responded by filing a motion to dismiss with respect to two of the challenged provisions as well as a cross-motion for summary judgment. The district court granted the State's motions, denied Safe Havens' motion, and entered a final order and judgment on June 30, 2003. Safe Havens filed its notice of appeal on July 2, 2003.

¶ 9 On appeal, Safe Havens argues that none of the new amendments should be applied to its initiative because the initiative petition was filed prior to the effective date of S.B. 28. In the alternative, Safe Havens contends that all five of the challenged provisions are unconstitutional because they violate both the right to initiative under article VI, section 1 of the Utah Constitution and free speech protections granted by both the Utah and United States constitutions. We have jurisdiction pursuant to section 78–2–

2(3)(j) of the Utah Code. Utah Code Ann. § 78–2–2(3)(j) (2002).

## STANDARD OF REVIEW

■ ¶ 10 A grant of summary judgment is appropriate only when "there is no genuine issue as to any material fact … and the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Because the issue of constitutionality presents a question of law, 'we review the trial court's ruling for correctness and accord it no particular deference.'" *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 424 (Utah 1995) (quoting *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887 (Utah 1988)).

■ ¶ 11 Similarly, when reviewing a lower court's grant of a motion to dismiss, "[b]ecause we consider only the legal sufficiency of the complaint, we grant the trial court's ruling no deference[, and] we review it for correctness." *Franco v. Church of Jesus Christ of Latter–Day Saints*, 2001 UT 25, ¶ 10, 21 P.3d 198 (internal quotations omitted).

## ANALYSIS

### I. RETROACTIVITY

¶ 12 As an initial matter, we must determine which, if any, of the newly-amended initiative provisions apply to Safe Havens' proposed initiative. Safe Havens argues that none of the provisions of S.B. 28 should apply to its initiative because S.B. 28 did not go into effect until more than one month after Safe Havens' initiative was approved for circulation. Safe Havens contends that it need only comply with the law in effect at the time it filed its initiative application, and that requiring it to comply with the new amendments to the initiative statute amounts to an impermissible retroactive application of the law. Safe Havens observes that if the court adopts its position on this issue, its arguments concerning four of the five disputed provisions will be mooted, leaving only its

---

3. This last provision was contained in the pre-amendment initiative statute and has been re-  tained, without change, in the current statute.

challenge to the Signature Removal Provision, which existed in its current form prior to the 2003 amendments.

¶ 13 The State asserts that requiring Safe Havens to comply with certain provisions of S.B. 28 does not amount to a retroactive application of the law because there are not one, but two dates on which an initiative must be considered and approved subject to the law in effect at the time. First, the lieutenant governor must consider and approve the initiative for circulation when it is initially filed. *See* Utah Code Ann. § 20A–7–202(5) (2003). Second, after the initiative has been circulated, the lieutenant governor must determine whether the initiative has garnered the requisite number of signatures and met all other applicable requirements in order to be approved for placement on the ballot. *Id.* § 20A–7–207. Accordingly, the State argues, the lieutenant governor must look to the law in effect at the time that she makes these separate determinations. Consistent with this position, on May 12, 2003, the State informed Safe Havens that only four provisions of S.B. 28 would apply to Safe Havens' initiative. Two of these—the Senate District Requirement and the One–Year Requirement—are currently challenged by Safe Havens.

¶ 14 The State's reasoning accords with our holding in *Owens v. Hunt*, 882 P.2d 660 (Utah 1994), which concerned a municipal initiative to limit growth in the city of St. George. The petitioner in *Owens* sought to have the municipal initiative placed on the general election ballot, which was arguably permitted under the initiative statute in place at the time the petitioner first filed his initiative application with the city recorder. *Id.* at 661. However, after the application had been filed, but prior to its being returned and approved for the ballot, the legislature amended the initiative statute. *Id.* The new amendment provided for the submission of municipal initiatives only at municipal elections, making the petitioner's initiative ineligible for the general election ballot and delaying its placement on a ballot for one year, when the next municipal election was scheduled. *Id.* The petitioner argued that the law in effect at the time he commenced the initia-

tive process should govern the timing of his initiative's placement on the ballot. *Id.* We disagreed, stating that "[p]etitioner's entitlement or right to an initiative election did not accrue until the initiative petition containing a proper number of certified signatures was filed with the . . . [r]ecorder" and action was taken thereon. *Id.* "Only at that time did the right of petitioner and the sponsors accrue to have the initiative proposal submitted to the electorate." *Id.*

¶ 15 Likewise, here, Safe Havens filed an application on March 21, 2003, in order to have its initiative approved for circulation. S.B. 28 went into effect on May 5, 2003. By a letter dated May 12, 2003, the lieutenant governor informed Safe Havens that four provisions of S.B. 28 would apply to Safe Havens' initiative petition. In the letter, the lieutenant governor did not list the Public Meetings Requirement or the Same–or–Similar Ban since these provisions would have come into play at the time Safe Havens initially applied for approval, an event which had already taken place. However, the other provisions listed in the letter, including the Senate District Requirement and the One–Year Requirement, contained conditions that would have to be met before the lieutenant governor could approve the initiative for the ballot, an event that would not occur for several months.

¶ 16 Safe Havens complains that the legislature should not be able to change the signature gathering requirements "in midstream." However, the lieutenant governor must evaluate a proposed initiative in relation to the law in effect at the relevant time, whether that be the time the initiative is considered for circulation or the time it is considered for placement on the ballot. This is true even if the law changes in the interim. Thus, the application of the Senate District Requirement and the One–Year Requirement to Safe Havens' initiative does not amount to a retroactive application of the law, but rather, is prospective in effect. Furthermore, we note that Safe Havens was apprised of the State's intention to apply the new amendments to its initiative at the time the initiative was approved for circulation. Hence, it is difficult to conclude, as Safe

Havens does, that the application of the amendments to Safe Havens' initiative is unfair.

## II. JUSTICIABILITY

¶ 17 Before discussing Safe Havens' constitutional challenges, we must also determine whether Safe Havens may appropriately bring challenges to provisions of the initiative statute that are not being applied to its initiative. In the letter listing the provisions with which Safe Havens would be required to comply, the Public Meetings Requirement and the Same–or–Similar Ban were not included as applicable provisions. Consequently, since the State has determined not to apply these two provisions to Safe Havens, the State contends that there is no case or controversy presented that is ripe for adjudication. *See Barnard v. Utah State Bar,* 857 P.2d 917, 919 (Utah 1993).

¶ 18 Safe Havens counters that "Utah courts are not constrained by any 'case or controversy' requirement." Rather, Safe Havens contends, justiciability issues are governed by the Utah Declaratory Judgment Act, which is to be "liberally construed and administered," Utah Code Ann. § 78–33–12 (2002), and that this court therefore allows for a "wide interpretation of what constitutes a 'justiciable controversy,'" *Salt Lake County Comm'n v. Salt Lake County Attorney,* 1999 UT 73, ¶ 12, 985 P.2d 899. Hence, Safe Havens asks this court to resolve the constitutionality of these two provisions now so that it may be afforded "relief from uncertainty and insecurity with respect to [its] rights," *see* Utah Code Ann. § 78–33–13 (2002), especially with regard to any future litigation, which Safe Havens asserts is "substantially likely" to ensue.

¶ 19 Under the Utah Declaratory Judgment Act, district courts are granted jurisdiction "to determine any question or construction or validity of a statute that affects the rights, status, or other legal relations of any person and to declare that person's rights, status, or legal relations under the statute." *Miller v. Weaver,* 2003 UT 12, ¶ 15, 66 P.3d 592; *see also* Utah Code Ann. § 78–33–2. We have previously acknowledged that "[w]hile the power of Utah's judi-

ciary is not constitutionally restricted to 'cases' and 'controversies,'" there are still four elements that must be satisfied for a court to proceed with a declaratory judgment action: "(1) a justiciable controversy, (2) parties whose interests are adverse, (3) a legally protectible interest residing with the party seeking relief, and (4) issues ripe for determination." *Miller,* 2003 UT 12 at ¶ 15, 66 P.3d 592 (citing *Jenkins v. Swan,* 675 P.2d 1145, 1148 (Utah 1983)); *see also Baird v. State,* 574 P.2d 713, 715 (Utah 1978). Although "statutes authorizing courts to render declaratory relief should be liberally construed, the courts must, nevertheless, operate within the constitutional and statutory powers and duties imposed upon them. The courts are not a forum for hearing academic contentions or rendering advisory opinions." *Baird,* 574 P.2d at 715.

¶ 20 Here, the lieutenant governor determined that the Public Meetings Requirement and the Same–or–Similar Ban would not apply to Safe Havens' initiative. Because these provisions are not applicable to Safe Havens at this time, there is no current controversy to adjudicate, nor does Safe Havens have a current, legally protectible interest with regard to these two provisions. *See id.* at 716 ("A party to whom a statute is inapplicable cannot question its constitutionality by seeking a declaration of rights."). Furthermore, an issue is not ripe for review where there is no "actual or imminent clash" between the parties. *Boyle v. Nat'l Union Fire Ins. Co.,* 866 P.2d 595, 598 (Utah Ct.App.1993) (quotation omitted).

¶ 21 Safe Havens argues that because there is a "substantial likelihood" that an actual controversy will develop, the "adjudication will serve a useful purpose in avoiding future litigation," especially since Safe Havens is "committed to the cause of placing its initiative on the ballot." *See Salt Lake County Attorney,* 1999 UT 73 at ¶ 12, 985 P.2d 899 ("[T]he issues are ripe for adjudication where it appears 'there is an actual controversy, or that there is a substantial likelihood that one will develop so that the adjudication will serve a useful purpose in resolving or avoiding controversy or possible

litigation.'" (quoting *Salt Lake County v. Salt Lake City*, 570 P.2d 119, 121 (Utah 1977))). However, while these matters may eventually be adjudicated before a court, they are not, in fact, presently being adjudicated, nor are we convinced that future adjudication is imminent or necessarily "substantially likely." As we have noted, the broad "substantial likelihood" standard "does not go so far as to require courts to become involved in the adjudication of moot or abstract questions, nor as is sometimes stated, to furnish a fishpond for judicial legal advice." *Salt Lake County*, 570 P.2d at 121 (citation omitted).

¶ 22 Under these standards, Safe Havens is not entitled to contest the constitutionality of the Public Meetings Requirement or the Same–or–Similar Ban, and it is unnecessary for this court to reach those issues at this time. We now turn to a discussion of the constitutionality of the remaining three provisions challenged by Safe Havens.

## III. CHALLENGES UNDER ARTICLE VI, SECTION 1 OF THE UTAH CONSTITUTION

¶ 23 Safe Havens argues that the challenged provisions violate article VI, section 1 of the Utah Constitution, which reserves to the people the right to initiate legislation. Safe Havens contends that under our ruling in *Gallivan v. Walker*, 2002 UT 89, 54 P.3d 1069, the legislature is required "to enact legislation that implements and enables the exercise of the people's right to initiative," *id.* at ¶ 27, and that the newly-amended initiative statute, instead of enabling that right, unduly burdens the ability to place an initiative on the ballot. The State contends that the provisions are reasonable regulatory measures that are nondiscriminatory, and thus, unlike the provision struck down in *Gallivan*, the challenged provisions do not unduly burden the initiative process. In order to evaluate the constitutionality of the Senate District Requirement, the Signature Removal Provision, and the One–Year Requirement, we must first determine the appropriate standard of review applicable to legislative enactments challenged under article VI, section 1 of the Utah Constitution.

### A. Standard of Review

¶ 24 Safe Havens proposes two alternative standards by which this court should review the challenged provisions. First, Safe Havens suggests that, under the language of *Gallivan*, the initiative right cannot be "unduly burden[ed] or diminish[ed]," *see id.* at ¶ 28, and that under this standard each challenged provision "imposes undue burdens on the initiative right, and none enables or facilitates the right." In the alternative, Safe Havens proposes that, because the right to initiative is a "fundamental right," *see id.* at ¶ 24, this court should apply the same "heightened scrutiny standard" that we applied to the multi-county signature requirement at issue in *Gallivan*. Under this standard, the burden of proof shifts to the State to show that a challenged provision "actually and substantially furthers a valid legislative purpose" and is "reasonably necessary to further a legitimate legislative goal." *Id.* at ¶ 42 (quoting *Lee v. Gaufin*, 867 P.2d 572, 582–83 (Utah 1993)).

¶ 25 The State counters that legislative enactments are imbued with a presumption of constitutionality, and heightened scrutiny would not be appropriate in this case because "[s]uch a level of scrutiny is not required by state [or] federal law, will unduly interfere with [l]egislative authority to establish the procedures for initiatives, and will cause tremendous turmoil in election law requirements." Rather, the State suggests that the level of scrutiny for such constitutional challenges should vary "depending upon the circumstances, the rights involved, and the impact on those rights," and that the circumstances of this case call for only a rational or reasonable basis level of scrutiny.

¶ 26 In *Gallivan*, we stated that "[t]he reserved right and power of initiative is a fundamental right under article VI, section 1 of the Utah Constitution." 2002 UT 89 at ¶ 24, 54 P.3d 1069. As we explained in that case,

Initiative is the power of a voter to directly legislate via exercising the right to vote. Like the right to vote generally, the initiative right guarantees participation in the political process. It is a constitutionally

guaranteed right that forms an implicit part of the life of a free citizen in a free society. The initiative right encourages political dialogue and allows the general populace to have substantive and meaningful participation in enacting legislation that impacts society. It is democracy in its most direct and quintessential form.

*Id.* at ¶ 25 (internal quotations and citations omitted).

¶ 27 Further, "[t]he voters' right to initiative does not commence at the ballot box: The voters' right to legislate via initiative includes signing a petition to get the proposed initiative on the ballot." *Id.* at ¶ 26. Thus, "[t]he right to vote on an initiative cannot exist without the voters' unfettered right to legislate through initiative, which necessarily begins with the circulating and signing process." *Id.* "Because the people's right to directly legislate through initiative and referenda is sacrosanct and a fundamental right, Utah courts must defend it against encroachment and maintain it inviolate." *Id.* at ¶ 27.

¶ 28 While we continue to recognize that the initiative right is fundamental under our state constitution, we also note that the ability to legislate through the initiative process is solely a state-created right and would not exist in the absence of a state provision creating the right. *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1211 (10th Cir.2002); *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir.1997); *Gallivan*, 2002 UT 89 at ¶ 104, 54 P.3d 1069 (Thorne, J., dissenting). This right, though fundamental under our state constitution, is not unfettered, but comes with a built-in limitation. Article VI, section 1 states,

> The legal voters of the State of Utah *in the numbers, under the conditions, in the manner, and within the time provided by statute*, may[ ] initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute. . . .

Utah Const. art. VI, § 1, cl. (2)(a)(i) (emphasis added). This constitutional provision, while granting the right to initiative, simultaneously circumscribes that right by granting the legislature leave to regulate, by statute, the manner in which the right is exercised. Not only is the legislature granted the authority to do so, but it is required to "enact legislation to enable the people to exercise their reserved power and right to directly legislate through initiative." *Gallivan*, 2002 UT 89 at ¶ 28, 54 P.3d 1069 (citing *Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994)).

¶ 29 In carrying out this duty, the legislature may not "pass laws that unduly burden or diminish the people's right to initiate legislation." *Id.* Due to "the fundamental nature of the right of initiative . . ., the vitality of ensuring that the right is not effectively abrogated, severely limited, or unduly burdened by the procedures enacted to enable the right and to place initiatives on the ballot is of paramount importance." *Id.* at ¶ 27. This does not mean, however, that the legislature may never pass regulations that have the effect of making it more difficult to enact legislation by initiative. Indeed, we recognized in *Gallivan* that there are circumstances in which the legislature may legitimately "impose restrictions that may, through their operation, make it more difficult to place an initiative on the ballot." *Id.* at ¶ 53. We observed that

> [t]he legislature can impose restrictions—such as requiring a particular form of petition, setting reasonable time frames to ensure the efficiency of the process, or requiring signers to be registered voters—which would have the effect of making it more difficult to get initiatives on the ballot, but only to the extent that those restrictions comport with article VI, section 1 of the Utah Constitution, do not violate other constitutional provisions, and further legitimate legislative purposes such as deterring fraud, ensuring the efficiency of the process, or ensuring a modicum of numerical support for an initiative.

*Id.* Thus, it is clear from *Gallivan* that each legislative enactment regulating the initiative process need not be subjected to heightened scrutiny review.

¶ 30 In *Gallivan*, we addressed the constitutionality of the "multi-county signature requirement," a precursor to the current Senate District Requirement. In addition to

obtaining a certain number of signatures statewide, the multi-county signature requirement required sponsors of initiatives to obtain signatures from registered voters in each of at least twenty of Utah's twenty-nine counties equal to 10 percent of all the votes cast for governor during the last gubernatorial election in the respective county in which the votes for governor were cast. Utah Code Ann. § 20A–7–201(2)(a) (1998). The appellants in *Gallivan* challenged the requirement under the uniform operation of laws provision of the Utah Constitution. *See* Utah Const. art. I, § 24. Consequently, in declaring the provision to be unconstitutional, we applied a heightened standard of scrutiny in accordance with our established uniform operation of laws analysis. *Gallivan*, 2002 UT 89 at ¶¶ 34–64, 54 P.3d 1069.

¶ 31 Under that analysis, a statutory provision may be unconstitutional if it creates a classification that is discriminatory; that is, if it creates a classification that "treats the members of the class or subclasses disparately." *Id.* at ¶ 43 (citing *State v. Mohi*, 901 P.2d 991, 997 (Utah 1995)). If a discriminatory classification exists, the court then determines whether that classification is constitutionally permissible. *Id.* The level of scrutiny applied to legislative enactments under the uniform operation of laws analysis varies depending on the nature of the classification and the nature of the right at issue. *See id.* at ¶¶ 39–40. "Where a legislative enactment implicates a 'fundamental or critical right' or creates classifications which are 'considered impermissible or suspect in the abstract,' we apply a heightened degree of scrutiny." *Id.* at ¶ 40 (quoting *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 426 (Utah 1995)). A provision subject to this heightened degree of scrutiny will be constitutional "only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal." *Id.* at ¶ 42 (quoting *Lee*, 867 P.2d at 582–83).

¶ 32 The multi-county signature requirement at issue in *Gallivan* was found to create a discriminatory classification because it had a disparate impact on urban and rural voters. Because this geographic distribution requirement was based on counties, which are not population based, it had the "effect of diluting the power of urban registered voters and heightening the power of rural registered voters in relation to an initiative petition," and thus allowed "voters in rural counties to wield a disproportionate amount of power in the determination of whether an initiative qualifie[d] to be placed on the ballot." *Id.* at ¶ 45. Consequently, because the multi-county signature requirement created a discriminatory classification and also impacted the fundamental right of initiative, we determined that the provision was subject to heightened scrutiny under our uniform operation of laws analysis. *Id.* at ¶¶ 41–46. Because the provision did not withstand this level of scrutiny, we declared it unconstitutional. *Id.* at ¶ 64.

¶ 33 The present case is distinguishable from *Gallivan*. There, heightened scrutiny was particularly appropriate because there were two constitutional values that required due recognition: (1) the uniform operation of laws provision in article I, section 24, which disfavors discriminatory classifications that have a disparate impact on similarly situated parties, and (2) the right to initiative granted to the citizens of Utah by article VI, section 1. *See Lee*, 867 P.2d at 581. This is not the case here. Safe Havens does not challenge the initiative statute under the uniform operation of laws provision of the Utah Constitution. Safe Havens concedes that "the challenged provisions do not create impermissible or suspect classifications among Utah citizens." In fact, the challenged provisions do not create any classifications but apply equally to all Utah citizens.

¶ 34 Rather, Safe Havens challenges the amended initiative statute solely under article VI, section 1 of the Utah Constitution. Safe Havens argues only that the provisions infringe on the initiative right, which is a right that, though fundamental, is self-limiting in that it grants to the legislature the authority to regulate the initiative process. We repeat that, in carrying out this duty, the legislature may not unduly burden or diminish the initiative right. *See Gallivan*, 2002

UT 89 at ¶¶ 27–28, 54 P.3d 1069; *Owens*, 882 P.2d at 661. However, each legislative enactment challenged under article VI, section 1 need not be subjected to heightened scrutiny review. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections," and subjecting every initiative regulation to heightened scrutiny "would tie the hands of [s]tates seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Thus, applying heightened scrutiny to each and every provision challenged under article VI, section 1 is neither required nor appropriate.

¶ 35 In promulgating the appropriate standard of review, we reiterate that "[i]t is axiomatic that laws enacted by the legislature are presumed to be constitutional and that the legislature is accorded wide latitude in complying with constitutional directives such as the one contained in article VI, section 1." *Owens*, 882 P.2d at 661. The essential task for a court in conducting an article VI, section 1 analysis is to determine whether the enactment unduly burdens the right to initiative. In making this determination, a court should assess whether the enactment is reasonable, whether it has a legitimate legislative purpose, and whether the enactment reasonably tends to further that legislative purpose. In evaluating the reasonableness of the challenged enactment and its relation to the legislative purpose, courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose.

¶ 36 Additionally, in ascertaining the underlying legislative purpose, while this court should not "indulge highly speculative hypotheses as to a statute's purpose in applying the presumption of constitutionality," *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 373 (Utah 1989) (Stewart, J., concurring in part) (citing *Malan v. Lewis*, 693 P.2d 661, 671 (Utah 1984)) (further citations omitted), neither are we limited to " 'those purposes that can be plainly shown to have been held by some or all legislators.' " *Ryan*, 903 P.2d at 427 (quoting *Blue Cross & Blue Shield of*

*Utah v. State*, 779 P.2d 634, 641 (Utah 1989)) (applying lower level scrutiny under uniform operation of laws analysis). We will make our determination " 'on the basis of reasonable or actual legislative purposes.' " *Blue Cross*, 779 P.2d at 641 (quoting *Malan*, 693 P.2d at 671 n. 14). Thus, "we do not require exact proof of the legislative purposes; it is enough if a legitimate purpose can be reasonably imputed to the legislative body." *Ryan*, 903 P.2d at 427; *see also Blue Cross*, 779 P.2d at 641.

¶ 37 The standard that we announce today "does not purport to require the [l]egislature to find the least restrictive manner of furthering its purpose," but because this standard requires the court to consider the burden imposed by the measure and the importance of the underlying legislative purpose, it does not allow "such wide latitude as to virtually abandon judicial review." *See Condemarin*, 775 P.2d at 373 (Stewart, J., concurring in part). Hence, this standard, though bearing a resemblance to our traditional minimal scrutiny review, requires a more exacting analysis. We now proceed under this standard of review to evaluate the remaining three provisions challenged by Safe Havens.

### B. Senate District Requirement

¶ 38 A person seeking to place an initiative on the ballot for a vote of the people must obtain "legal signatures equal to 10% of the cumulative total of all votes cast for all candidates for governor at the last regular general election at which a governor was elected," both on a statewide level and in each of at least twenty-six of Utah's twenty-nine senate districts. Utah Code Ann. § 20A–7–201(2)(a) (2003). Safe Havens does not contest the statewide 10 percent requirement, but challenges only the requirement that it must meet the 10 percent threshold in at least twenty-six senate districts.

¶ 39 Safe Havens argues that the Senate District Requirement unduly burdens the right to initiative because the requirement makes "it harder to pass law by initiative than it is to pass law by legislation." Safe Havens complains that because it takes only fifteen senators to pass legislation, but an

initiative sponsor must meet the 10 percent threshold in twenty-six of twenty-nine senate districts, the Senate District Requirement does not honor the principle that "[t]he power of the legislature and the power of the people to legislate through initiative and referenda are coequal, coextensive, and concurrent and share equal dignity." *Gallivan,* 2002 UT 89 at ¶ 23, 54 P.3d 1069 (internal quotations omitted). In addition, Safe Havens contends that the legislative record indicates that this provision was passed merely to "ensure that any issue that qualifies for the ballot has support in areas of Utah outside the Wasatch Front" and that, according to *Gallivan,* "[c]ountering the possibility of localized legislation is not a legitimate legislative purpose." *Id.* at ¶ 57. Safe Havens reasons that this requirement, like the one struck down in *Gallivan,* "gives the minority control of the initiative power" and is likewise unconstitutional. *Id.* at ¶ 61.

¶ 40 In its brief, the State explains the legislative purposes underlying the Senate District Requirement as follows:

> [The legislature] sought to exercise its constitutional authority to set forth the numbers of signatures for an initiative to get on to the ballot, to do so in a manner that ensured that there was a modicum of support before the matter would appear on the ballot, and, since it is a statewide issue, to ensure that that support was throughout the statewide population, and finally to do so in a manner that was non-discriminatory and constitutional.

These purposes have support in the text of the legislative debates regarding the passage of S.B. 28.

¶ 41 The Senate District Requirement does not run afoul of *Gallivan,* where the challenged legislative enactment actually worked to counter "localized legislation" by giving disproportionate weight to rural votes as compared to urban votes. *See id.* at ¶ 45. Because the multi-county signature requirement addressed in *Gallivan* was based on geographically-drawn counties, rather than on numerical population, it discriminated against urban voters by diluting the voting power of the four urban counties, where more than three-fourths of Utah's population

resides, in favor of the twenty-five rural counties containing less than one-fourth of the statewide population. *Id.* at ¶¶ 45–46, 49. Therefore, we found the provision to be unconstitutional because it created a discriminatory classification that could not withstand heightened scrutiny. *Id.* at ¶¶ 46–64.

¶ 42 The Senate District Requirement does not prompt the same constitutional concerns that we addressed in *Gallivan.* By basing the signature requirement on evenly divided, population-based senate districts, the legislature has not created a discriminatory classification or caused a disparate impact among classes or subclasses. Thus, whereas in *Gallivan* the legislature intended that the rural minority would act as a check and a balance on the urban majority, the Senate District Requirement does not assign disproportionate power to any particular group of voters. Rather, it ensures that there is support for a particular initiative spread, more or less, evenly throughout the state. We hold this to be a legitimate legislative purpose.

¶ 43 Further, the principle that "[t]he power of the legislature and the power of the people to legislate through initiative and referenda are coequal, coextensive, and concurrent and share equal dignity," *id.* at ¶ 23 (internal quotation omitted), is not offended by the requirement that an initiative sponsor meet the 10 percent threshold in at least twenty-six senate districts. Affording "equal dignity" to the power of the people and of the legislature to initiate legislation does not necessarily mean that the same procedures will be followed in each instance. Rather, the right of the people to initiate legislation is afforded due consideration as long as the procedures enacted to enable the right are reasonable and reasonably tend to further a legitimate legislative purpose. We conclude that the Senate District Requirement does not unduly burden the initiative right, but is a reasonable means of achieving the legitimate legislative purpose of ensuring a modicum of support for an initiative throughout the statewide population.

## C. Signature Removal Provision

¶ 44 Safe Havens contends that the "burdens imposed by the Senate District Requirement are magnified when viewed in conjunction with the Signature Removal Provision[ ]." The initiative statute provides that "[a]ny voter who has signed an initiative petition may have his signature removed from the petition by submitting a notarized statement to that effect to the county clerk." Utah Code Ann. § 20A 7 205(3)(a)(i). Safe Havens does not challenge the right of a voter to remove his signature, but rather the time period in which a signature may be removed.

¶ 45 The initiative statute provides that initiative sponsors must submit all of the gathered signatures to the county clerks by June 1, at which point the county clerks must verify that all the names are of persons who are over eighteen years old, are residents of Utah, and are registered voters. *Id.* § 20A-7–206(1) to –206(3). The county clerks must deliver the signatures to the lieutenant governor by July 1, whereupon, the lieutenant governor will declare whether the initiative petition is sufficient. *Id.* §§ 20A–7–201(2)(b),–206(3)(c). Any voter who has signed the petition is allowed to remove his or her signature up until the time that the petition is submitted to the lieutenant governor. *See id.* § 20A–7–205(3)(c).

¶ 46 Safe Havens argues that the timing of this provision unduly burdens the initiative right, with no legitimate legislative justification, because it allows "initiative opponents unfettered access to petition signers during the month of June (after sponsors are prohibited from submitting additional replacement signatures), during which time signers may remove their names from the petition." Thus, Safe Havens asserts, initiative opponents may defeat an initiative by focusing on "one or two (or at most, four) [s]enate districts in which sponsors have cleared the 10 [percent] hurdle by the narrowest margin."

¶ 47 In *Halgren v. Welling,* this court recognized the right of a petitioner to withdraw his signature, stating that " '[n]o authority has been found which denies to a petitioner the right to withdraw his name while the petition is being circulated and before it has

been presented to the person or body with whom it is required to be filed.' " 91 Utah 16, 29, 63 P.2d 550, 556 (1936) (quoting *In re Initiative Petition No. 2, City of Chandler,* 170 Okla. 507, 41 P.2d 101, 102 (1935)) (further citations omitted). The court continued, "Neither do any of the authorities recognize the right of a petitioner to withdraw his name from a petition after it has been finally acted upon and the prayer thereof has been granted by the person or body who is required to act upon it." *Id.* (quotation omitted).

¶ 48 Safe Havens suggests that it would be "completely in keeping with this [c]ourt's pronouncement in *Halgren*" if this court were to institute a scheme, similar to that followed in some other states, "in which signers could remove their names up until the petitions are submitted to the county clerks." *See e.g., Rekart v. Kirkpatrick,* 639 S.W.2d 606, 607 n. 1 (Mo.1982) (quoting Mo.Rev.Stat. § 116.110 (Supp.1981)) (holding that signatures may be withdrawn only up until the time that the initiative petition is completed and filed). However, in *Halgren,* this court considered and rejected that type of scheme, stating that "[t]he weight of authority is that the withdrawal may be made at any time before the petition has been acted upon." 91 Utah at 30, 63 P.2d at 556. Further, "this court is committed to the doctrine, in the absence of statute, which permits withdrawal after filing a petition and before action thereon is taken." 91 Utah at 29, 63 P.2d at 556 (internal quotation omitted). In *Halgren,* we clearly intended to allow the right to withdraw one's signature after the initiative petition was submitted to the county clerks, and before the county clerks delivered the petition to the lieutenant governor for final action.

¶ 49 Although we recognize the potential difficulty this provision may cause to initiative sponsors, such a regulation is reasonable in light of the importance of protecting the right of a voter to withdraw his signature, which, in the absence of a contrary statutory provision, continues up until the petition is finally acted upon by the lieutenant governor. Utah voters have the ability to decide whether or not to support a particular initiative,

and "[t]here is no substantial reason why a person who has once signed a petition may not, at any time before the petition has been acted upon, withdraw his name, and if timely done, his name should not be counted." *Halgren,* 91 Utah at 30, 63 P.2d at 556.

### D.  One–Year Requirement

¶ 50 Finally we address the constitutionality of the One–Year Requirement.  Under this provision, initiative sponsors are required to "qualify the petition for the regular general election ballot no later than one year after the application is filed."  Utah Code Ann. § 20A–7–202(4)(a) (2003).  If initiative sponsors are unsuccessful in obtaining the requisite number of signatures within one year's time, the sponsors must submit a new application and collect signatures again.  *Id.* § 20A–7–202(4).  This provision, introduced by S.B. 28, replaced a similar requirement in the previous initiative statute that allowed sponsors two years in order to obtain the needed number of signatures.  Utah Code Ann. § 20A–7–202(4) (1998).  Safe Havens contends that this new requirement has no legitimate legislative purpose, but was passed simply to make it more difficult to place initiatives on the ballot.

■ ¶ 51 Although there is little in the record pointing to the precise legislative purpose underlying the One–Year Requirement, the State indicates that all of the provisions challenged by Safe Havens are "designed to ensure ... that there be an orderly, known and efficient process."  Further, in its discussion of the One–Year Requirement in particular, the State alludes to a number of other possible legislative purposes, citing *American Constitutional Law Foundation, Inc. v. Meyer,* 120 F.3d 1092 (10th Cir.1997).  There, the Tenth Circuit upheld a regulation of Colorado's initiative procedure that required initiatives to qualify within six months.  *Id.* at 1096, 1098–99.  Proponents of the regulation "assert[ed] several interests:  preserving the integrity of the state's elections, maintaining an orderly ballot, and limiting voter confusion."  *Id.* at 1099.  The State also maintains that the One–Year Requirement does not unduly burden the initiative process, pointing to three prior initiatives that sponsors qualified for the ballot within six weeks, three months, and five months, respectively.

¶ 52 It is clear that the legislature, in carrying out its duty to regulate the initiative process, has the authority to set time limits. Utah Const. art.  VI, § 1 ("The legal voters of the State of Utah in the numbers, under the conditions, in the manner, and within the time provided by statute, may [ ] initiate any desired legislation....").  Indeed, the legislature must set such time limits if the initiative process is to proceed in any kind of order.  We only require that these time limits be reasonable in that they do not unduly burden the right to initiative.  In *Tobias v. South Jordan City Recorder,* we approved a thirty-five-day statutory time limit for submitting referenda.  972 P.2d 373 (Utah 1998). We "acknowledge[d] that the statutory timetable is extremely short" and that "[s]ponsors of referendum petitions must move promptly to gather the required number of signatures," but nonetheless approved the time limit.  *Id.* at 374.  The signature requirements for initiative petitions are somewhat more exacting than those required for referendum petitions; however, based on the evidence before us, we cannot articulate any basis upon which a one-year time period would be unreasonable.  Setting a one-year window in which initiative sponsors must demonstrate support for their cause is not an unreasonable restraint on the initiative right, but rather merely ensures that there is an orderly, known, and efficient process.  Thus, this requirement, like the Senate District Requirement and the Signature Removal Provision, does not violate article VI, section 1 of the Utah Constitution, but is a reasonable, regulatory provision.

### IV.  FREE SPEECH ANALYSIS

■ ¶ 53 Finally, Safe Havens argues that the challenged provisions violate free speech protections guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Safe Havens contends that the provisions burden "core political speech," or at least "impose severe restrictions upon rights of free speech and political expression," and thus are subject to strict

scrutiny under federal free speech analysis.[4] We disagree.

¶ 54 Safe Havens bases its argument, in part, on *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), in which the appellants challenged a law regulating Colorado's initiative process. The law, which made it a felony to pay petition circulators, had the effect of reducing the number of circulators available for any particular initiative since initiative sponsors were limited to using volunteers. *Id.* at 417, 419, 108 S.Ct. 1886. In affirming the Tenth Circuit Court of Appeals, the U.S. Supreme Court agreed that the case involved "core political speech," and that the law acted as a "limitation on political expression" and was "subject to exacting scrutiny." *Id.* at 420, 108 S.Ct. 1886. The Court explained that the refusal to permit initiative sponsors to pay circulators limits political expression in two ways:

> First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422–23, 108 S.Ct. 1886 (citation omitted). Thus, the "prohibition against the use of paid circulators ha[d] the inevitable effect of reducing the total quantum of speech on a public issue." *Id.* at 423, 108 S.Ct. 1886. Due to this limitation on political expression, the Court stated that the burden the state would have to overcome in order to justify the law was "well-nigh insurmountable." *Id.* at 425, 108 S.Ct. 1886.

¶ 55 Safe Havens also cites *Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), in which the Court struck down three state initiative regulations requiring petition circulators to wear name badges and to comply with other disclosure requirements. The *Buckley* Court noted that petition circulation

involved "core political speech," but also recognized the principle that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 186–87, 119 S.Ct. 636 (internal quotations and citations omitted); *see also Burdick v. Takushi,* 504 U.S. 428, 433–34, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (finding that "[e]lection laws will invariably impose some burden on individual voters," and that every voting regulation need not be subject to strict scrutiny). Thus, the Court upheld some of the state's regulations, but declared the disclosure requirements to be invalid because they infringed upon circulators' right to anonymous free speech, and therefore, as was the case in *Meyer,* reduced the number of people who were willing to spread the political message. *Buckley,* 525 U.S. at 194–200, 119 S.Ct. 636.

■■■ ¶ 56 In the present case, both *Meyer* and *Buckley* are inapposite. Both cases involved provisions that regulated the manner in which initiative sponsors could disseminate their message and had the effect of limiting the number of messengers available to spread the political message. These cases do not stand for the proposition that every regulation of the initiative procedure impacts free speech and is thus subject to strict scrutiny. Rather, "the right to free speech ... [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure, which is not the case here." *Save Palisade Fruitlands v. Todd,* 279 F.3d 1204, 1211 (10th Cir.2002) (holding a Colorado law granting right of initiative to home rule counties and not to statutory counties did not infringe the fundamental right of free speech for purposes of equal protection analysis). Both *Meyer* and *Buckley* "involved an unconstitutional regulation of speech that happened to occur in the context of an existing initiative scheme." *Id.* at 1212.

¶ 57 Contrary to Safe Havens' assertions, the provisions of the initiative statute do

---

4. Safe Havens indicates that it does not bring a federal challenge to the One–Year Requirement because the Tenth Circuit has already upheld a six-month time limit in the face of a federal free speech challenge. *See Am. Constitutional Law Found., Inc. v. Meyer,* 120 F.3d 1092, 1098–99 (10th Cir.1997).

nothing to restrict speech. Initiative proponents are free, and even encouraged, to disseminate their message throughout the state. Nothing in the initiative statute serves to limit the number of messengers available to engage in this sort of political expression. While the regulations may arguably make it more difficult to place an initiative on the ballot, "nothing ... suggest[s] that there is a protected right to have a particular initiative on the ballot." *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir.1996) (holding that the State of Oklahoma's refusal to place an unconstitutional initiative on the ballot did not infringe on free speech rights). Free speech protections "guarantee[ ] neither success in placing an item on the ballot nor eventual ratification by voters. Rather, free speech is found in the interplay of ideas during the attempt to capture the voters' curiosity and support." *Gallivan*, 2002 UT 89 at ¶ 109, 54 P.3d 1069 (Thorne, J., dissenting); *see also Skrzypczak*, 92 F.3d at 1053 ("Skrzypczak mistakenly conflates her legally-protected interest in free speech with her personal desire to have [her initiative] on the ballot."). Thus, the provisions challenged by Safe Havens do not limit free speech and do not violate First and Fourteenth Amendment free speech guarantees.

¶ 58 Even if regulation of the initiative process were found to infringe on Safe Havens' free speech rights, this does not lead to the conclusion that the provisions are subject to strict scrutiny review. The Supreme Court recognized in *Burdick* that a "more flexible standard applies" and that "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." 504 U.S. at 434, 112 S.Ct. 2059 (internal quotations omitted). As discussed above, the provisions at issue do not impose unreasonable or discriminatory burdens on the rights of voters to participate in the initiative process. Hence, the legislative purposes that we have discussed in connection with those provisions would be sufficient to justify any minimal restrictions arguably imposed by the provisions.

¶ 59 Safe Havens also challenges the provisions under the free speech protections guaranteed by article I, section 15 of the Utah Constitution. That section states, "No law shall be passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. I, § 15. As already discussed, the regulatory provisions at issue in this case do not impinge on free speech rights. The Senate District Requirement, the Signature Removal Provision, and the One–Year Requirement do nothing to "abridge or restrain the freedom of speech." "[I]nitiative supporters are free to approach any citizen within any, and ideally all," of Utah's twenty-nine senate districts and express their views without restriction. *See Gallivan*, 2002 UT 89 at ¶ 145, 54 P.3d 1069 (Thorne, J., dissenting). "Free and robust public debate ... can neither be equated with successfully communicating one's ideas, nor with successfully placing an initiative on the ballot, or with the proposal being adopted as law." *Id.* at ¶ 146. Rather, free speech protections guarantee Safe Havens' "right to engage in discourse that is essential to [its] attempt to place the measure on the ballot," and this right is not contravened by any of the challenged provisions. *Id.*

**CONCLUSION**

¶ 60 The Senate District Requirement and the One–Year Requirement are applicable to Safe Havens' initiative. Requiring Safe Havens to comply with these two provisions does not amount to a retroactive application of the law. Rather, the lieutenant governor must abide by the law in effect at the respective times that she evaluates the initiative petition, whether that be the time that she initially considers the petition for circulation, or the time that she finally approves the petition for the ballot. Also, Safe Havens may not challenge the constitutionality of the Public Meetings Requirement or the Same–or–Similar Ban since the State has not sought to apply these provisions to its initiative.

¶ 61 In evaluating the constitutionality of the remaining three provisions, we conclude that legislative enactments challenged directly under article VI, section 1 of the Utah

Constitution, which grants to the people the right to pass legislation by initiative, are not subject to heightened scrutiny review. Such enactments must be reasonable and must reasonably tend to further a legitimate legislative purpose. In making this determination, the court should weigh the burden imposed on the person seeking to place the initiative on the ballot against the importance of the legislative goal. Under this standard of review, the Senate District Requirement, the Signature Removal Provision, and the One–Year Requirement are reasonable, regulatory provisions that further legitimate legislative interests and do not violate article VI, section 1 of the Utah Constitution.

¶ 62 Additionally, the challenged provisions do not offend free speech rights under the Utah or United States constitutions. The regulations in no way limit or abridge Safe Havens' right to freely express its political views. Rather, Safe Havens is free to widely disseminate its political message as it chooses.

¶ 63 Therefore, we affirm the judgment of the district court.

¶ 64 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.